In re ARKANSAS RATE CASES. ST. LOUIS·SOUTHWESTERN RY. CO.
v. ALLEN et al., Board of R. R. Com'rs of Arkansas. ST.
LOUIS, I. M. & S. RY. CO. v. SAME.

(Circuit Court, E. D. Arkansas, W. D. May 3, 1911.)

Nos. 1,636, 1,637.

1. CARRIERS (§ 12*)—REGULATION OF RATES—POWERS OF STATE.

A state has the power to establish rates to be charged by common carriers for the exclusively intrastate carriage of freight and passengers, either by the direct action of the lawmaking department or by a commission to whom that department has by law delegated it, subject to the restriction that the rates made must be reasonable and fair to the carrier and the public, and not confiscatory of the carrier's property.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

2. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS OF RATES—BURDEN OF PROOF.

Rates established by a state for the intrastate carriage of freight and passengers are presumptively reasonable and just, and the burden of proof to show the contrary is upon the party attacking them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

3. CARRIERS (§ 12*)—STATE REGULATION OF RATES—SUIT FOR INJUNCTION.

To justify a court in setting aside rates established by a state for the intrastate carriage of freight and passengers, it is incumbent on the carriers to prove by evidence which is clear, unequivocal, and convincing, and leaves the court reasonably free from doubt, that they are unjust and confiscatory, and that to make them compensatory the rates would not have to be so high as to make them oppressive to the public.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

4. CARRIERS (§ 12*)—RATES—RECIPROCAL RIGHTS OF CARRIER AND PUBLIC.

The rights of carriers and the public with respect to rates are reciprocal. The carrier is entitled to ask a fair return on the value of its property which it employs for the public convenience, and the public is entitled to demand that no more be exacted from it for the use of the public highway than the services rendered are reasonably worth.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. COMMERCE (§ 34*)—STATE REGULATION OF RATES—CONSTITUTIONALITY—INTERFERENCE WITH INTERSTATE COMMERCE.

Rates established by a state for the intrastate carriage of freight or passengers necessarily indirectly affect interstate rates; but that fact does not render the establishment of such rates unconstitutional, as an interference with interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 82; Dec. Dig. § 34.*]

6. CARRIERS (§ 12*)—REGULATION OF RATES—POWERS OF STATE.

The right of every sovereign state to regulate public service corporations and the rates to be charged by them, subject to the provisions of the fourteenth constitutional amendment, prohibiting deprivation of one's property without due process of law, and other constitutional provisions, rests upon the police power of the state.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

7. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—REASONABLENESS—EVIDENCE.

The fact that intrastate freight and passenger rates established by a state are not lower than those in other states of itself raises no presumption that such rates are reasonable, and not confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

8. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—REASONABLENESS—EVIDENCE.

The reasonableness of rates for the intrastate carriage of freight and passengers established by a state, as affecting a particular carrier, cannot be determined alone from the kind or amount of business done by such carrier; the fact remaining, which must be considered, that it is entitled to earn a fair return on its investment, if it can be done without making the rates oppressive.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

9. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—REASONABLENESS—NET EARNINGS OF COMPANY.

In computing the net earnings of a railroad company for the purpose of determining the reasonableness or confiscatory effect of rates established by the state on intrastate business, sums paid out by the company for injuries to persons may properly be included in operating expenses.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

10. COURTS (§ 508*)—JURISDICTION OF FEDERAL COURTS—SUIT TO ENJOIN ENFORCEMENT OF RAILROAD RATES.

Under the laws of Arkansas creating and prescribing the powers of the state railroad commission, a railroad company, affected by an order of such commission establishing intrastate rates, made after a full hearing, may maintain a suit in the federal court to enjoin the enforcement of such rates as confiscatory and unconstitutional, without first applying to the commission for their reduction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1418–1430; Dec. Dig. § 508.*]

11. CARRIERS (§ 18*)—RATES ESTABLISHED BY STATE—SUIT TO ENJOIN ENFORCEMENT—ESTOPPEL BY ACQUIESCENCE.

The fact that railroad companies complied with an order of a state commission establishing freight rates for five years raises a strong, but not conclusive, presumption that such rates are reasonable; but it does

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not estop the companies from thereafter maintaining a suit in equity to enjoin the enforcement of such rates as confiscatory, on clear proof that conditions have so changed, by the increase of operating expenses or otherwise, that the net earnings thereunder on their entire intrastate business have ceased to be compensatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 16–20; Dec. Dig. § 18.*]

12. CARRIERS (§ 18*)—RATES ESTABLISHED BY STATE—SUIT TO ENJOIN ENFORCEMENT.

Where a fair trial for one year by railroad companies of rates established by a state on intrastate business has demonstrated that such rates are not compensatory, the companies cannot be deprived of their right to an injunction restraining the further enforcement of such rates by speculation as to the effect their continuance might have on future business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 16–20; Dec. Dig. § 18.*]

13. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—SUIT TO ENJOIN ENFORCEMENT—EARNINGS OF COMPANY FROM INTRASTATE BUSINESS.

In computing the net earnings of a railroad company from its intrastate business under rates established by the state, to determine whether or not such rates are compensatory, miscellaneous earnings and expenses, not directly attributable to either its intrastate or interstate business, may properly be apportioned between the two on the basis of the earnings from each source.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

14. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—SUIT TO ENJOIN ENFORCEMENT—EARNINGS OF COMPANY.

All of the stock of a railroad company owning lines in Arkansas was owned by a second company, which latter had been given 40 per cent. of the stock of an express company in consideration of the grant of the exclusive privilege of doing business over all the lines controlled by it, including those of the subsidiary company in Arkansas, and it annually received dividends on such stock, but no part of the same was apportioned to the subsidiary company. *Held*, that in computing the earnings of the subsidiary company, for the purpose of determining whether intrastate rates established by the state of Arkansas were confiscatory, it must be credited with its proper share of the dividends received on the express stock, which, in the absence of other evidence, might properly be apportioned on a mileage basis.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

15. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—SUIT TO ENJOIN ENFORCEMENT—EARNINGS OF COMPANY.

In computing the earnings of a railroad company from its intrastate business, for the purpose of determining whether rates established by the state are confiscatory, the fair rental value of the dining room, saloon, check stand, etc., privileges in a passenger station must be included in such earnings, although it in fact grants such privileges for a merely nominal rental.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

16. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—SUIT TO ENJOIN ENFORCEMENT—EXPENSES OF COMPANY.

In computing the net income of a railroad company, for the purpose of determining the reasonableness of state rates, the intrastate business of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the company is justly chargeable with its proper proportion of the expense incurred by the company in maintaining agents in various parts of the country to solicit business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

17. CARRIERS (§ 12*) — RATES ESTABLISHED BY STATE — REASONABLENESS — VALUE OF PROPERTY DEVOTED TO INTRASTATE BUSINESS.

On an issue as to whether railroad rates on intrastate business established by a state are reasonable or confiscatory with respect to a railroad company doing both intrastate and interstate business, the proportion of the entire value of the property of the company in the state which is devoted to the intrastate business, and on which it is entitled to earn a fair return from such business, may fairly be determined on the basis of the earnings, by taking the same proportion of the entire value that the intrastate earnings bear to the entire earnings in the state from both intrastate and interstate business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

18. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—REASONABLENESS—EXPENSE OF DOING LOCAL BUSINESS.

On an issue as to whether railroad rates on intrastate business established by a state are reasonable or confiscatory with respect to a company doing both intrastate and interstate business, the expense of doing the intrastate business cannot properly be computed alone on the basis of the earnings from such business as compared with the total earnings from both classes; but other factors should be taken into consideration, such as the comparative rates received for and expense of handling each class, the kind of traffic forming the bulk of each, especially where the interstate business is largely in the carriage of grain and similar commodities paying a low rate, which forms but a small part of local shipments, and other matters which under the particular circumstances affect the question.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

19. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—REASONABLENESS—COST OF MAINTENANCE.

In apportioning the cost of maintaining the way and structures of a railroad between its intrastate and interstate business, on an issue as to the reasonableness of intrastate rates established by a state, there seems no fairer basis than the earnings from the two classes of business; while, on the other hand, the cost of locomotive and car maintenance which should be charged to each class of business can be more nearly approximated by using the car mile basis.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

20. CARRIERS (§ 12*)—RATES ESTABLISHED BY STATE—REASONABLENESS—COST OF MAINTENANCE.

The apportionment of the cost of maintenance of freight cars of a railroad company considered, as between its intrastate business, its interstate business terminating or originating in the state, and its through or transstate business, on an issue as to the reasonableness of rates established by the state.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**21. Carriers (§ 12\*)—Rates Established by State—Reasonableness—Expenses.**

 The basis for apportionment of various expenses of a railroad company between its intrastate and interstate business considered, on an issue as to the reasonableness of rates established by the state.

 [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.\*]

**22. Carriers (§ 12\*)—Rates Established by State—Reasonableness—Injunction.**

 Railroad companies in Arkansas *held* entitled to earn an income of 6 per cent. per annum on the value of their property employed in intrastate business, computed on the basis of the assessed valuation of such property, and from the earnings of a prosperous year to reserve a surplus of 1.5 per cent. in addition; and the rates established by the Arkansas Railroad Commission and the two-cent passenger law of February 9, 1907 (Acts Ark. 1907, p. 10), *held* confiscatory as to such companies, and their enforcement enjoined.

 [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.\*]

In Equity. Suits by the St. Louis Southwestern Railway Company and by the St. Louis, Iron Mountain & Southern Railway Company against R. P. Allen and others, composing the Board of Railroad Commissioners of the State of Arkansas. On final hearing. Decree for complainants.

See, also, 163 Fed. 141, and 168 Fed. 720.

Moore, Smith & Moore, for complainants.

Joseph M. Hill and James H. Harrod, for defendants.

TRIEBER, District Judge. The St. Louis, Iron Mountain & Southern Railway Company, which will be referred to herein as the Iron Mountain Railway, and the St. Louis Southwestern Railway Company, referred to as the Southwestern Railway Company, instituted these proceedings against the Board of Railroad Commissioners of the state of Arkansas to enjoin the enforcement of the freight and passenger tariffs promulgated by that board in pursuance of the powers delegated to it by the laws of the state of Arkansas. The grounds upon which the relief is sought are that the rates which apply solely to intrastate traffic are noncompensatory and confiscatory when applied to the entire intrastate business of each of the companies. A preliminary injunction was granted in 1908 by Mr. Justice Van Devanter, then one of the Circuit Judges of this circuit. His opinion is reported in 163 Fed. 141. In 1909 the temporary injunction was modified by this court. 168 Fed. 720. The pleadings were perfected and a large volume of testimony taken by the parties. At the urgent request of counsel for all parties, the services of a master to make findings of facts and state his conclusions of law were dispensed with, notwithstanding what was said in Chicago, Minneapolis & St. Paul Ry. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417, and the cause heard by the court upon the pleadings and proofs.

It is thought best that at the threshold of these cases the most important principles of law applicable to cases of this nature should be

stated. These are rules of law which have been so frequently determined by the highest court of the land that they may now be properly regarded as elementary, and for this reason it will be sufficient to merely state them, without unduly lengthening this opinion with a long list of citations to sustain them.

[1] (a) A state has the power to establish rates to be charged by common carriers for the exclusively intrastate carriage of freight and passengers, and this may be done by direct action of the lawmaking department, or a commission to whom that department of the government has by law delegated it.

(b) The rates thus established must be reasonable and fair to the carriers, as well as the public. The state may not make rates so as to confiscate the carrier's property; nor can the carrier make rates which are oppressive to those who by necessity are compelled to employ its services. Whether they are so or not is a question for judicial investigation and determination.

[2] (c) Presumptively rates thus established by authority are reasonable and just, and the burden of proof to show the contrary is upon the party attacking them.

[3] (d) To justify courts to set aside rates thus established, it is incumbent upon the carriers to prove by evidence which is clear, unequivocal, and convincing, and leaves the court reasonably free from doubt, that they are unjust, that they amount to a taking of property without just compensation, and that to make them compensatory the rates would not have to be so high as to make them oppressive to the public.

[4] (e) The rights of carriers and the public are reciprocal. The carrier is entitled to ask a fair return upon the value of its property which it employs for the public convenience, and the public is entitled to demand that no more be exacted from it for the use of the public highway than the services rendered are reasonably worth, and not be oppressive.

Before passing upon the evidence and the law arising therefrom, there are some other important rules of law raised by counsel for both parties which should be determined at this time; for some of them, if sustained, would relieve the court of the necessity of examining the voluminous evidence in these cases, and others will, to a great extent, control the final conclusions to be drawn from the evidence.

## Interference with Interstate Commerce.

[5] It is claimed that as the rates prescribed for intrastate business, freight as well as passenger, necessarily affect interstate rates, such acts of the states, whether by direct legislation or through a commission clothed with such power, although limited by the provisions of the statute to intrastate business exclusively, are a burden upon interstate commerce and therefore violative of the commerce clause of the national Constitution.

That intrastate tariffs bear certain relations to, and to some extent control, interstate rates, cannot be doubted. The evidence in this case establishes that fact conclusively, and even in the absence of such

evidence the court would be justified to take judicial notice of it. No better illustration is needed than the facts and conclusions of law in Gulf, C. & S. F. Ry. Co. v. Texas, 204 U. S. 403, 413, 27 Sup. Ct. 360, 51 L. Ed. 540. And this seems to be the rule adopted by the Interstate Commerce Commission since the decision in the Gulf R. R. Case. Ambrey & Semple v. Galveston, etc., Ry. Co., 17 Interst. Com. Com'n R. 267, and rule 56b of administrative rules. Although the Texas case was one involving freight only, the same principle applies to passenger rates. In fact, it is more apparent in the latter than in the former. Even in the absence of a rule. to. that effect by the Interstate Commerce Commission, or of decisions of the courts, if the states of Arkansas, Texas, and Missouri each enact a two-cent rate fare, it would be folly for a carrier to attempt to charge a higher rate for interstate or transstate passengers in those states; for passengers would purchase tickets to the state line of each state at the reduced local rates, and thus defeat the higher interstate rates, although the state rates are by the statutes of these states limited to intrastate transportation solely. As stated by Mr. Justice Brewer in his opinion in Gulf, C. & S. F. Ry. Co. v. Texas:

"In this respect there is no difference between an interstate passenger and interstate transportation. If Hardin, for instance, had purchased at Hudson an interstate ticket for Texarkana, intending all the while after he reached Texarkana to go on to Goldthwaite, he would not be entitled on his arrival at Texarkana to a new ticket from Texarkana to Goldthwaite at the proportionate fraction of the rate prescribed by the Interstate Commerce Commission for carriage from Hudson to Goldthwaite. The one contract of the railroad company having been finished, he must make a new contract for his carriage to Goldthwaite, and that would be subject to the laws of the state within which that carriage was to be made."

Nor does the intention of the shipper or passenger to avoid the higher interstate rates by the purchase of tickets or shipments at the lower intrastate rates change the rule of law. On that point Mr. Justice Brewer, in the Gulf Case, answered negatively the question thus propounded:

"If the only contract of shipment was for local transportation, would the state law in respect to the mode of transportation be set one side by the federal law in respect to interstate transportation, on the ground that the shipper intended, after the one contract of shipment had been completed, to forward the goods to some place outside the state?"

But does the fact that these intrastate rates bear such relation to interstate rates necessarily make the statutes of a state regulating charges for intrastate transportation by carriers engaged in interstate as well as intrastate commerce void? No authorities directly sustaining this claim have been cited to the court, although the cases in which statutes of this nature have been attacked are numerous. The only cases cited are those holding in general terms that state statutes which amount to some regulation of foreign or interstate commerce, or which directly or by their necessary operation burden interstate commerce, are invalid, as violative of the commerce clause of the national Constitution. On the other hand, Mr. Justice Brewer, in Ames v. Union Pacific Ry. Co. (C. C.) 64 Fed. 165, 172, affirmed sub nomine

Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, expressly held:

"Neither can I understand how the reduction of local rates, as a matter of law, interferes with interstate rates. It is true the companies may, for their own convenience, to secure business, or for any other reason, rearrange their interstate rates, and make them conform to the local rates prescribed by the statute; but surely there is no legal compulsion. The statute of the state does not work a change in interstate rates, any more than an act of Congress prescribing interstate rates will legally work a change in local rates. Railroad companies cannot plead their own convenience, or the effects of competition between themselves and other companies, in restraint of the otherwise undeniable power of the state."

Louisville & Nashville Ry. Co. v. Eubank, 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416, cited for complainants, is not in point, as all that was decided in that case was that a state cannot compel carriers to adjust their intrastate rates with reference to their interstate rates.

But it is urged that in the Ames Case the evidence failed to show the effect of the state rates on interstate rates, while in the cases at bar that fact is fully established. In Peik v. Chicago, etc., Ry. Co., 94 U. S. 164, 177, 24 L. Ed. 97, Mr. Chief Justice Waite, speaking for the court on a contention of this nature, said:

"As to the effect of the statute as a regulation of interstate commerce. The law is confined to state commerce or such interstate commerce as directly affects the people of Wisconsin. Until Congress acts in reference to the relations of this company to interstate commerce, it is certainly within the power of Wisconsin to regulate its fares, etc., so far as they are of domestic concern. With the people of Wisconsin this company has domestic relations. Incidentally these may reach beyond the state. But certainly, until Congress undertakes to legislate for those who are without the state, Wisconsin may provide for those within, even though it may indirectly affect those without."

While that part of the opinion which holds that a state may regulate such "interstate business as affects the people of Wisconsin" has been severely criticised, if not overruled by later decisions, that part applying to the intrastate traffic has never been questioned and has been repeatedly followed. But, treating the question as one never before authoritatively determined, the conclusion of the court, upon well-settled principles of elementary law, is that this contention of complainants cannot be sustained.

[6] The right of every sovereign state to regulate public service corporations and the rates to be charged by them, subject to the provisions of the fourteenth amendment prohibiting deprivation of one's property without due process of law and other provisions of the national Constitution, rests upon the police powers, which "are nothing more or less than the powers of government inherent in every sovereignty." License Cases, 5 How. 583, 12 L. Ed. 256; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 393, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 521, 18 Sup. Ct. 418, 42 L. Ed. 819.

While, generally speaking, the police power of a state is said to extend to the protection of "the public health, the public morals, and the public safety," the law does not recognize these as the extent of the power, but, as stated by Mr. Justice Harlan in Chicago, B. & Q.

Ry. Co. v. Drainage Commissioners, 200 U. S. 561, 592, 26 Sup. Ct. 341, 50 L. Ed. 596:

"We hold that the police power of a state embraces regulations designed to promote the *public convenience and the general prosperity*, as well as the regulations designed to promote the public health, the public morals, or the public safety."

In Lake Shore, etc., Ry. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 703, the same learned justice, after reviewing the previous decisions of that court, states the conclusions of the court in the following language:

"Now it is evident that these cases [referring to the cases cited in the opinion] had no reference to the health, morals, or safety of the people of the state, but only to the public convenience. They recognized the fundamental principle that, outside of the field directly occupied by the general government under the powers granted to it by the Constitution, all questions arising within a state, *that relate to its internal order or that involve the public convenience or the general good*, are primarily for the determination of the state, and that its legislative enactments relating to those subjects, and which are not inconsistent with the state Constitution, are to be respected and enforced in the courts of the Union, if they do not by their operation directly entrench upon the authority of the United States or violate some right protected by the national Constitution. The power here referred to is, to use the words of Chief Justice Shaw, the power 'to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth and of the subjects of the same.' Commonwealth v. Alger, 7 Cush. [Mass.] 53, 85. * * * It may be that such legislation is not within the 'police power' of a state, as those words have been *sometimes*, although *inaccurately*, used; but in our opinion the power, whether called police, governmental, or legislative, exists in each state, by appropriate enactments not forbidden by its own Constitution or by the Constitution of the United States, to regulate the relative rights and duties of all persons and corporations within its jurisdiction, and therefore to provide for the public convenience and the public good. This power in the states is entirely distinct from any power granted to the general government, although, when exercised, it may sometimes reach subjects over which national legislation can be constitutionally extended."

In Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. ——, decided January 3, 1911, involving a banking law providing for a guaranty fund to secure depositors, Mr. Justice Holmes, in speaking of the police power, said:

"It may be said in a general way that the police power extends to all the great public needs. It may be put forth in aid of what is sanctioned by usage or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

Among other cases in which the same rule is recognized the following may be appropriately referred to: Camfield v. United States, 167 U. S. 518, 525, 17 Sup. Ct. 864, 42 L. Ed. 260; Chicago, etc., R. R. Co. v. Nebraska, 170 U. S. 57, 73, 18 Sup. Ct. 513, 42 L. Ed. 948; Lake Shore, etc., Ry. Co. v. Smith, 173 U. S. 684, 689, 19 Sup. Ct. 565, 43 L. Ed. 858; Bacon v. Walker, 204 U. S. 311, 318, 27 Sup. Ct. 289, 51 L. Ed. 499; Halter v. Nebraska, 205 U. S. 34, 41, 27 Sup. Ct. 419, 51 L. Ed. 696; Western Union Tel. Co. v. Milling Co., 218 U. S. 406, 31 Sup. Ct. 59, 54 L. Ed. 1088.

Professor Stimson, of Harvard University, in his able work on "Popular Lawmaking" says on that subject on page 164:

"Some writers endeavor to justify, under our Constitutions, the regulation of rates by the principle of eminent domain; but this source seems far-fetched and unnecessary. It is, of course, done under the police power; but the precedent for that use of the police power is to be found in the history of English law and statutes. Thus we have noted in the statute of Westminster I, A. D. 1275, that excessive toll contrary to the common custom of the realm was forbidden in market towns. The very phraseology of this statute indicates the antiquity of the doctrine that tolls must be reasonable; but 'toll' was always a technical term, not for ordinary prices of commodities, but for a use or service which was in some way dependent upon law or ordinance."

The same views are expressed in 3 Thompson on Corporations, § 2950 et seq., and Freund on Police Power, § 377.

It has been held by eminent authority that the police power is founded upon that maxim of public policy, "Salus populi suprema lex." Chief Justice Shaw, in Commonwealth v. Alger, 7 Cush. (Mass.) 53, 85, after holding that certain powers are not exercised under the right of eminent domain, but the police power, says:

"The power we allude to is the police power, the power vested in the Legislature by the Constitution, to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same."

The leading case on the subject of the state's power to regulate rates of corporations engaged in the management of public utilities is Munn v. Illinois, 94 U. S. 113, 125, 24 L. Ed. 77. Mr. Chief Justice Waite, in his opinion in that case, after carefully reviewing the English as well as American authorities on that subject, and referring to the police power as authority for such legislation, epitomizes his conclusions as follows:

"But we need not go further. Enough has already been said to show that, when private property is devoted to public use, it is subject to public regulation."

Mr. Justice Bradley, who concurred in the judgment in that case, in his dissenting opinion in the Sinking Fund Cases, 99 U. S. 700, 747, 25 L. Ed. 496, explains the issue involved therein by saying:

"The inquiry there was as to the extent of the police power in cases where the public interest is affected."

In Sands v. Manistee River Improvement Co., 123 U. S. 288, 295, 8 Sup. Ct. 113, 116, 31 L. Ed. 149, Mr. Justice Field, delivering the unanimous opinion of the court, said on that subject:

"The internal commerce of a state—that is, the commerce which is wholly confined within its limits—is as much under its control as foreign or interstate commerce is under the control of the general government."

If, then, the power to regulate carriers' rates rests upon the police power, which, under the decisions cited, is in fact coextensive with the governmental power of the state, it requires no extended argument to prove that a regulation or statute of a state enacted under

that power is not void, because it incidentally affects the commerce clause or any other provision of the national Constitution, especially if it is not in conflict with any act of Congress on that subject, or when Congress has not seen proper to act upon that subject. In the Legal Tender Cases, 12 Wall. 457, 551; 20 L. Ed. 287, it was claimed that a statute making depreciated currency a legal tender for the payment of debts previously contracted was in conflict with the spirit of the fifth amendment to the Constitution; but the court, in overruling that contention, said:

"That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great loss, may, indeed, render property almost valueless, and may destroy the worth of contracts; but who ever supposed that, because of this, a tariff could not be changed, or a nonintercourse act or an embargo be enacted, or a war be declared?"

In Sherlock v. Alling, 93 U. S. 99, 103, 23 L. Ed. 819, it was held:

"In conferring upon Congress the regulation of commerce, it was never intended to cut the states off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it, without constituting a regulation of it, within the meaning of the Constitution. * * * And it may be said generally that the legislation of a state, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit."

In Hennington v. Georgia, 163 U. S. 299, 317, 16 Sup. Ct. 1086, 41 L. Ed. 166, a statute of the state of Georgia prohibiting the running of freight trains on Sundays was attacked as an interference with interstate freight trains; but it was upheld as a proper exercise of the police power of the state, although incidentally affecting interstate commerce. The court, after reviewing the authorities on the subject, held:

"These authorities make it clear that the legislative enactments of the state passed under the admitted police powers, and having a real relation to the domestic peace, order, health, and safety of their people, but which, by their necessary operation, affect to some extent, or for a limited time, the conduct of commerce among the states, are yet not invalid by force alone of the grant of power to Congress to regulate such commerce, and if not obnoxious to some other constitutional provision, or destructive to some right secured by the fundamental law, are to be respected in the courts of the Union until they are superseded and displaced by some act of Congress passed in execution of the power granted to it by the Constitution."

Other cases, in which the same principle of law is recognized are Railroad Co. v. Fuller, 17 Wall. 560, 21 L. Ed. 710; Escanaba Company v. Chicago, 107 U. S. 678, 687, 2 Sup. Ct. 185, 27 L. Ed. 442; Stone v. Mississippi, 101 U. S. 814, 25 L. Ed. 1079; Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 751, 4 Sup. Ct. 652, 28 L. Ed. 585; Beer Company v. Massachusetts, 97 U. S. 25, 32, 24 L. Ed. 989;

Railroad Commission Cases, 116 U. S. 307, 325, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Mugler v. Kansas, 123 U. S. 623, 667, 8 Sup. Ct. 273, 31 L. Ed. 205; Plumley v. Massachusetts, 155 U. S. 461, 472, 15 Sup. Ct. 154, 39 L. Ed. 223; Kidd v. Pearson, 128 U. S. 1, 20, 9 Sup. Ct. 6, 32 L. Ed. 346; Geer v. Connecticut, 161 U. S. 519, 534, 16 Sup..Ct. 600, 40 L. Ed. 793; Smith v. Alabama, 124 U. S. 465, 480, 8 Sup. Ct. 564, 31 L. Ed. 508; N. Y., N. H. & H. R. R. Co. v. New York, 165 U. S. 628, 631, 17 Sup. Ct. 418, 41 L. Ed. 853; Patapsco Guano Co. v. North Carolina Board, 171 U. S. 345, 350, 18 Sup. Ct. 862, 43 L. Ed. 191; Erb v. Morasch, 177 U. S. 584, 20 Sup. Ct. 819, 44 L. Ed. 897; Gladson v. Minnesota, 166 U. S. 427, 430, 17 Sup. Ct. 627, 41 L. Ed. 1064; Pennsylvania Railway Co. v. Hughes, 191 U. S. 477, 488, 24 Sup. Ct. 132, 48 L. Ed. 268; Crossman v. Lurman, 192 U. S. 189, 196, 24 Sup. Ct. 234, 48 L. Ed. 401; Austin v. Tennessee, 197 U. S. 343, 349, 21 Sup. Ct. 132, 45 L. Ed. 224; Pabst Brewing Co. v. Crenshaw, 198 U. S. 17, 26, 25 Sup. Ct. 552, 49 L. Ed. 925; McLean v. Denver & Rio Grande R. R. Co., 203 U. S. 38, 50, 27 Sup. Ct. 1, 51 L. Ed. 78; Hudson Water Co. v. McCarter, 209 U. S. 349, 357, 28 Sup. Ct. 529, 52 L. Ed. 828; Chicago, R. I. & Pacific Ry. Co. v. Arkansas, 219 U. S. 453, 31 Sup. Ct. 275, 55 L. Ed. ——, decided February 20, 1911; Duluth Brewing & Malt Co. v. City of Superior, 123 Fed. 357, 59 C. C. A. 481, 485; Logan & Bryan v. Postal Telegraph Co. (C. C.) 157 Fed. 570.

In Covington Bridge Co. v. Kentucky, 154 U. S. 204, 209, 210, 14 Sup. Ct. 1087, 38 L. Ed. 962, it was held that the class of commerce in which the power of the state is exclusive is that—

"which concerns the strictly internal commerce of the state, and, while the regulations of the state may affect interstate commerce indirectly, their bearing on it is so remote that it cannot be termed in any general sense an interference. * * * Congress has no power to interfere with police regulations relating exclusively to the internal trade of the states."

In L. & N. R. R. Co. v. Kentucky, 183 U. S. 503, 518, 22 Sup. Ct. 95, 46 L. Ed. 298, it was held:

"It may be that the enforcement of the state regulation forbidding discrimination in rates in the case of articles of a like kind carried for different distances over the same line may somewhat affect commerce generally; but we have frequently held that such a result is too remote and indirect to be regarded as an interference with interstate commerce, and that the interference with the commercial power of the general government, to be unlawful, must be direct, and not the merely incidental effect of enforcing the police powers of a state."

Another matter not to be overlooked is, if the state is without the power to regulate purely intrastate transportation, because it affects interstate traffic indirectly, where is it vested? Congress is clearly without power to do so, and, of course, it cannot delegate to a commission a power it does not itself possess. In Gibbons v. Ogden, 9 Wheat. 195, 6 L. Ed. 23, the leading case on that subject, the rule of law, which has never been questioned since, but always followed, was settled that the power committed to Congress by the Constitution does not extend to commerce wholly within the state. In the language of Chief Justice Marshall:

"The enumeration presupposes something not enumerated, and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a state."

"There can be but one rate, fixed by one authority, whether that authority be the state or Congress." Hanley v. Kansas City Southern Ry. Co., 187 U. S. 617, 620, 23 Sup. Ct. 214, 47 L. Ed. 333.

If complainants' contention is correct, transportation companies, so far as the exclusively internal commerce of a state is concerned, are beyond all control, either from the state or national government; for, as determined in Gibbons v. Ogden, supra, the Constitution excluded that class of commerce from the powers vested in Congress by the commerce clause, and, as all state rates indirectly affect interstate rates, they are, if complainants' contention is right, also void. See, also, on this point, the Employer's Liability Cases, 207 U. S. 463, 493, 28 Sup. Ct. 141, 52 L. Ed. 297.

The result of such a construction would be that the states do not possess one of the most important powers inherent in every government. The adoption of such a construction by the courts would be justifiable only if any other would do violence to a plain provision of the national Constitution or principles of law so firmly established by previous decisions of the highest court of the land that there is no longer room for construction. In the language of Mr. Justice Peckham in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 231, 20 Sup. Ct. 96, 104, 44 L. Ed. 136:

"If neither Congress nor the state Legislatures have such power, then we are brought to the somewhat extraordinary position that there is no authority, state or national, which can legislate upon that subject or prohibit such contracts. This cannot be the case."

Since preparing this part of the opinion that of Judge Sanborn, the senior Circuit Judge of this circuit, in Shepard v. Northern Pacific Ry. Co. (C. C.) 184 Fed. 765, has been received and carefully considered. The great learning of that eminent jurist entitles every opinion of his to the very highest consideration, and, if not conclusive on this court, is certainly very persuasive. A careful examination of the facts found in that case by the master and the court shows that they differ very materially from those established by the evidence in these cases. How necessary it is to determine questions of that nature upon the particular facts of each case is thus pointed out by that learned judge in his opinion:

"The reduction of local rates does not interfere with interstate rates 'as a matter of law,' yet it may do so as a matter of fact. Whether or not the general and sweeping reductions in local rates in Minnesota necessarily interfere with interstate rates and interstate commerce is in this case, as it must be in every case, a question of fact. The facts which determine that question in this case have been set forth in this opinion at great length, because it is upon them, and not upon legal inferences, that the answer to the question, whether or not the effect of the necessary operation of the acts and orders challenged is substantially to burden interstate commerce, now rests. Those facts are that it was not for 'their own convenience,' but at great inconvenience and loss, not on account of the 'effect of competition between themselves and other companies,' but because these acts and orders, the prohibition of discrimination between localities by the interstate commerce act and the laws of trade, forced them to do so, that the defendants reduced their

interstate commerce rates to a parity with the local rates and submitted to the loss of interstate revenue this action entailed."

The schedule of rates adopted by the Minnesota State Commission, as stated in that opinion, was such—

"that each rate for each class for any distance bore such an exact relation to each other rate that, given one rate out of the schedule, any other rate could be ascertained by mathematical calculation and without reference to the schedule itself."

It was also shown that a number of cities in that state were situated side by side with cities of the adjoining states of Wisconsin and North Dakota. These cities being the same distance, they had always been accorded like rates, in and out, by the railroads, and a failure by the companies to maintain like rates for these cities would seriously impair the power to transact their interstate business with these cities in the neighboring states; and the natural effect of these lower Minnesota state rates would give to the cities of that state on its border line an undue and unjust preference—an advantage, in fact, over the neighboring cities in adjoining states. The same conditions applied to the passenger traffic.

From these facts the conclusions reached by the master and approved by the court were that the natural and inevitable effect of these reductions was to compel the railroad companies to give an undue and unreasonable preference to localities in the state of Minnesota over those in adjoining states, in violation of the interstate commerce act of Congress. The court said:

"The effect of the necessary operation of these acts and orders was substantially to burden and directly to regulate the interstate commerce of the companies, by causing the transformation of that part of their transportation upon which their former interstate rates were higher than the sums of the locals over the border towns in Minnesota into local commerce at those sums, or by causing the companies to reduce their interstate fares and rates affected by the reduced local fares and rates to a parity therewith. This effect was unavoidable, because the interstate commerce law prohibited the companies from giving to Minnesota towns and cities the undue and unreasonable advantage, and from subjecting the cities and towns of other states in the vicinity to the undue and unreasonable disadvantages which a maintenance of their former interstate fares and rates and prescribed local fares and rates would have wrought, and because passengers and freight will move at the lowest available rates."

No such facts were proven in these cases, and for this reason the court is of the opinion that the conclusions reached in the Shepard Case are not applicable to these cases.

Since writing the foregoing, the opinion in Louisville & N. R. R. Co. v. Siler (C. C.) 186 Fed. 176, has been published, in which the same conclusions on this subject were reached as in this case.

### Rates in Other States.

[7] It is claimed by the attorneys for the state that, as there is no evidence that the rates sought to be enjoined are lower than those in other states, it must be presumed that they are reasonable. But that is not the law. On the contrary, assuming that the evidence introduced establishes the fact that the rates now attacked are no lower

than those charged in other states, that, of itself, would not be sufficient to sustain this claim, especially in the absence of proof that all the conditions are the same. As stated by Mr. Justice Brewer, then Circuit Judge, in Chicago & N. W. Ry. v. Dey (C. C.) 35 Fed. 881, 886, 1 L. R. A. 744:

"The fact that it is higher or lower [the schedule of rates] than other schedules in force elsewhere or at other times in this state does not necessarily determine its validity."

In Ames v. Union Pacific Ry. Co. (C. C.) 64 Fed. 165, 188, that same proposition was advanced and denied by the court. Mr. Justice Brewer, in his opinion, disposed of the contention by saying:

"It is, however, urged by the defendants that in the general tariffs of these companies there is an inequality, that the rates in Nebraska are higher than those in adjoining states, and that the reduction by House Rule 33 simply establishes an inequality between Nebraska and the other states through which the carriers run. The question is asked: Are not the people of Nebraska entitled to as cheap rates as the people of Iowa? Of course, relatively, they are; that is, the carriers must not discriminate against the people of any one state, but not necessarily absolutely as cheap, for the kind and amount of business and the cost thereof are factors which determine largely the question of rates, and these vary in the several states. The volume of business in one state may be greater per mile, while the cost of construction and maintenance is less. Hence, to enforce the same rates in both states might result in one in great injustice, while in the other it would only be reasonable and fair. Comparisons, therefore, between the rates of two states are of little value, unless all the elements that enter into the problem are present. It may be true, as testified by some of the witnesses, that the existing local rates in Nebraska are 40 per cent. higher than similar rates in the state of Iowa; but it is also true that mileage earnings in Iowa are greater than in Nebraska. In Iowa there are 230 people to each mile of railroad, while in Nebraska there are only 190, and as a general rule the more people there are the more business there is. Hence a mere difference between the rates in two states is of comparatively little significance."

Upon appeal, this excerpt was quoted in full and approved by the Supreme Court; that court saying:

"In these views we concur, and it is unnecessary to add anything to what was said by the Circuit Court on that point." 169 U. S. 540, 18 Sup. Ct. 431 (42 L. Ed. 819).

### Existing Conditions.

[8] It is next claimed that, in determining whether rates are reasonable or unreasonable, the controlling factors are "the kind of business, the amount of business, and the commercial conditions." Counsel then proceed to elaborate:

"In other words, a railroad that has a virtual monopoly of the business of more than a million people, with all the business it can do all the time in hauling the coal and lumber, farm products, and merchandise, is not entitled to the rate that a carrier would deserve that serves a sparsely settled community with only an occasional haul."

While this is true in some respects, it is equally true that such a carrier is entitled to rates sufficiently high to enable it to earn sufficient net profits to pay a reasonable interest on its investment, if it can be done without making the rates so high as to be oppressive. While a road "serving a sparsely settled community with only an oc-

casional haul" would not be justified in charging rates sufficiently high to earn the same return, or in some extreme cases any return, on its investment, if such rates have to be so high as to be oppressive, that is no reason for making the rates of a carrier that has more business so low as to make them noncompensatory; for, if that were the law, how would it benefit the carrier that its road is doing all the business it can handle? This question has been fully settled by numerous decisions of the courts, and, without quoting from them, the following will be found sustaining the rules of law as stated in paragraphs "b" and "e" of this opinion: Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; San Diego, etc., Co. v. Jasper, 189 U. S. 439, 466, 23 Sup. Ct. 571, 47 L. Ed. 892; Willcox v. Consolidated Gas Company, 212 U. S. 19, 48, 29 Sup. Ct. 192, 53 L. Ed. 382; In re Arkansas Railroad Rates, 168 Fed. (C. C.) 720, 733.

## Limit of Time in Proofs.

It is further claimed that the evidence on the part of complainants is confined to six months, from July 1 to December 31, 1907. It is true that the main evidence of the Iron Mountain Railway is confined to that period, and in the absence of other evidence, or some satisfactory explanation for its omission, should not be considered as sufficient to set aside the acts of a sovereign state. But there is also evidence of the business for other periods. The earnings and expenditures of the Iron Mountain Railway for the six months ending June 30, 1907, appear in Exhibit 8 to Mr. Johnson's testimony, and show the earnings for that period to be smaller than the later period, although the two cents per mile passenger rate did not go into effect until April, 1907. The business of the Southwestern Railway Company, earnings and operating expenses for the entire fiscal year ending June 30, 1908, is shown by Exhibit 11 to Mr. Kimbell's testimony. It is also shown by undisputed evidence that the year 1907 was one of the most prosperous years for both railways; that the effects of the financial panic were not felt by them at all until the latter part of November, 1907, and then only slightly, while they were more seriously felt during the year 1908. Exhibit 45 of Mr. Johnson, which is a statement of the gross earnings of the Iron Mountain for each six months period from January 1, 1900, to June 30, 1908, shows that the gross earnings for the period ending December 31, 1907, were the largest of any period, and the gross earnings per mile above the average of the eight years preceding it. The six months period ending December 31, 1907, is therefore the least favorable to the complainants, and for this reason no cause for complaint on the part of the state.

In addition to these facts, counsel for the state, in reply to a question from the court, admitted that the officials of these railways not only produced all documents, books, waybills, and other papers which would throw light on the subject, and furnished all information in their possession whenever requested by counsel for the state, but also permitted the attorneys and expert accountants for the state free access to all the books, accounts, and other papers in their possession, having such as were at division points sent to headquarters, when re-

quested, to enable them to prepare the defense, or verifying the exhibits presented by complainants. In view of these facts there is no substantial ground for the claim that the period selected by complainants was unfair to the state or insufficient to enable the court to determine the issues in these cases, or that the earnings and expenditures for those periods do not show a fair average of the business of complainants, at least fair to the defense. The fact that the able counsel for the state and expert accountants did not call for data of other periods than those produced by complainants and in evidence is, if not conclusive, at least persuasive, that they considered the evidence offered sufficient for a just determination of the issues involved.

### Personal Injuries.

[9] It is also claimed that complainants are not entitled to "charge in the expense of operation the sums they paid for injuries to persons." This claim cannot be treated seriously. It is true, as claimed by counsel, "that the people of Arkansas are not insurers of the risks of the railroad business;" but, on the other hand, such accidents cannot be wholly avoided, and, as there is no pretense that they were willful or intentional on the part of the officials of the companies, they must be considered as unavoidable risks of operation of the business. Many persons and corporations engaged in industrial pursuits of a character dangerous to employés or others insure themselves against such loss, and the premiums paid therefor are charged to expense of operation. Railroads, or rather these roads, for reasons which are not explained by the evidence in these cases, but probably economic, carry their own insurance against such losses, and charge them as expense of operation, as they would otherwise charge the premiums paid for the insurance, if they obtained it from insurance companies. As these indemnity insurance companies make the charge high enough to cover the expense of the management of their business and a profit on their investment, the policy of the railroad companies is probably most economical.

### Premature Filing of Suit.

[10] It is next claimed that, before applying for relief to this court, complainants should have applied to the commission, and only upon its refusal to grant it would an appeal to the courts lie. Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, is relied on as sustaining this contention; but neither the facts nor the conclusions of the court in that case are applicable to these now under consideration. In fact, so far as that case is applicable, it is a strong authority against this claim. There the rates were made by a commission clothed with judicial functions, its acts subject to review by appeal to the Supreme Court of the state. Pending such appeal a writ of supersedeas may be obtained, which would suspend operation of the action appealed from until the final disposition of the appeal. Yet the court held that, no matter what the statute called the acts of the commission, they were legislative, and not judicial; but, as the remedy by appeal had not been exhausted when the suits were instituted, the Circuit Court should have required them to exhaust

their remedy by appeal before granting the injunction. The decision was placed upon the ground of comity, the court saying:

"It seems to us only a just recognition of the solicitude with which their rights have been guarded that they should make sure that the state in its final legislative action would not respect what they think their rights to be before resorting to the courts of the United States. * * * As our decision does not go upon a denial of power to entertain the bills at the present stage, but upon our view as to what is the most proper and orderly course in cases of this sort when practicable, it seems to us that the bills should be retained for the present, to await the results of the appeals, if the companies see fit to take them."

The opinion in that case is fully explained in Willcox v. Consolidated Gas Co., supra, and by Judge Hook in A., T. & S. F. Ry. Co. v. Love (C. C.) 174 Fed. 59, and M., K. & T. Ry. Co. v. Love (C. C.) 177 Fed. 493, affirmed March 28, 1911, 185 Fed. 321. The last cited cases arose under the Constitution and laws of Oklahoma, which were similar to those of Virginia, where the Prentis Case arose.

In addition, it may be proper to refer in this connection to the fact that Mr. Hampton, for a number of years, and at the time of the institution of these suits, a member of the Arkansas State Railroad Commission, and for two years its chairman, testified that:

"All the reductions of rates made by the commission were after public hearings, to which the railroads were invited, and which they attended, and most always against their protest and objections."

### Acquiescence.

[11] It is next claimed that the freight tariffs now attacked had been in force without any material change for five years before this bill was filed and the claim made that they were confiscatory; that this long delay was such an acquiescence as to prevent a court of equity from granting an injunction at this late day to restrain their further enforcement. While such long acquiescence undoubtedly raises a very strong presumption that the rates are reasonable, if the conditions are the same, it would not be conclusive, as changed conditions might overthrow this presumption entirely. The law is well settled that rates made by a commission on one or more commodities so low as to be noncompensatory for the transportation of those particular commodities do not justify an interference by the courts unless it is further shown that these rates would reduce the net earnings of the carrier on its entire business to an extent that they would cease to be compensatory. Minneapolis & St. Louis Ry. Co. v. Minnesota, 186 U. S. 257, 268, 22 Sup. Ct. 900, 46 L. Ed. 1151; Atlantic Coast Line R. R. Co. v. North Carolina Corporation Commission, 206 U. S. 1, 24, 27 Sup. Ct. 585, 51 L. Ed. 933; Northern Pacific Ry. Co. v. North Dakota, 216 U. S. 579, 30 Sup. Ct. 423, 54 L. Ed. 624; Railway Company v. Gill, 54 Ark. 112, 115, 15 S. W. 18, 11 L. R. A. 452, affirmed in 156 U. S. 649, 665, 15 Sup. Ct. 484, 39 L. Ed. 567; Railway Company v. Smith, 60 Ark. 221, 244, 29 S. W. 752.

It is, therefore, incumbent upon the carrier complaining to show that the earnings of its entire business, after deducting the legitimate expenses, are noncompensatory, within the meaning of the law, before

it is entitled to such relief as is sought in these cases. The freight rates established eight years ago may have been high enough under conditions then prevailing to be compensatory. The increase of wages of employés and of material necessary for the operation of the road having been gradual, as shown by the evidence, although, as claimed, decreasing the net profits, may have left it doubtful whether they had ceased to be compensatory within the meaning of the law.

Additional burdens, and consequent expenditures, imposed on railroads between 1903 and 1907 by legislation, state and national, for the purpose of protecting the lives of passengers and employés, or protecting them from injury, or adding to the comfort of the public, may have reduced the net earnings still lower, and yet not so low as to make them confiscatory; but when, in 1907, the passenger rates were reduced by the Legislature of Arkansas from three to two cents per mile, a reduction of 33⅓ per cent. on the gross earnings from the entire passenger traffic, this, added to the former reductions and increased expenditures, may have resulted, after a fair trial, in convincing complainants that the net profits from all the earnings in the state had reached almost the vanishing point. It was then that they were, for the first time, in position to invoke the aid of the courts with any reasonable prospect of success.

Another important factor to be considered in connection with this claim is that the evidence (Exhibit 30) establishes conclusively that in the ten years preceding the institution of these actions there has been a steady and very considerable increase in the cost of everything necessary for the maintenance and operation of the road, taxes, and the cost of labor. It is true that by improvement of methods better results are obtained, and the cost thereby considerably reduced; but, on the whole, it is claimed that the cost of operation has increased much more than the saving. The comparison of net earnings of the roads for the years 1897 and 1907, as shown by Exhibit Z of defendants, is not fair, as the report of the Interstate Commerce Commission, from which these figures were obtained, also shows that there was a great depression of all railroad traffic at that time, and only in June, 1897—i. e., the last month of the 12 covered by that report—did the earnings of the railroads show a healthy revival of commercial conditions.

The Commission in that report say (page 9):

"A review of statistics of operation since 1890 would disclose the fact that each year ending June 30, from 1890 to 1893, inclusive, closed with an increase in net and gross earnings as compared with the previous year. The year 1893–94, however, proved to be a disastrous one for railways; the gross earnings being less $147,000,000, and the net earnings $50,000,000, than the corresponding items of the previous year. The year 1894–95 showed practically no recovery from the depression of the previous year. The year 1895–96 closed with an increase in gross earnings of $74,000,000 and net earnings of $27,000,000. But this movement toward better conditions did not continue during the year covered by the present report, which, as compared with 1896, shows again a decrease in gross earnings of $28,000,000, and in net earnings of $7,000,000. It was not until June, 1897—that is to say, the last month of the 12 covered by this report—that the railway earnings showed a healthy revival of commercial conditions. This fact indicates the

character of the year covered by the present report, and must be held in mind by one who endeavors to interpret the figures about to be presented."

On the other hand, the evidence shows that the year 1907, with which the comparison was made, was one of the best in the history of railroads. As claimed by the testimony of Mr. McPherson, the increased efficiency of operation had been overcome, and far outrun, by the forces working against it; that the increased rate of wages, the increased cost of material, the burdens imposed by legislation, and the increase of taxes, had "far outrun" the benefits that had accrued from those improvements.

"And even acquiescence in past continuing injury does not estop their victim from enjoining their future continuance." Layton Pure Food Co. v. Church & Dwight Co., 182 Fed. 35, 41, 104 C. C. A. 475; Love v. A. T. & S. F. Ry. Co., 185 Fed. 321, and authorities cited there.

As stated by Judge Sanborn in the last-cited case:

"Courts of equity have plenary power, and it is often their duty to issue mandatory injunctions to restore and then maintain a condition of things that has been wrongfully disturbed or changed."

Under such conditions it cannot be said that they had acquiesced for such a period of time as to preclude a court of equity from granting them relief if otherwise entitled thereto, especially in view of the testimony of Commissioner Hampton that "the reductions of rates were made most always against their protest and objections." Los Angeles v. Los Angeles City Water Co., 177 U. S. 558, 579, 20 Sup. Ct. 736, 44 L. Ed. 886. Whether they have succeeded in establishing such a state of facts by the evidence in the cases at bar can only be determined from a careful analytical examination of the proofs and the application of the rules of law governing such cases.

### Continued Loss.

[12] It is next claimed that, to entitle plaintiffs to an injunction, it must be shown that they will suffer a "continued loss"; and in support of that it is contended that the lower freight rates and the reduced passenger rates will increase the volume of traffic to such an extent as to make up the decrease of those reductions. This claim is wholly speculative. In the language of Mr. Justice Brewer in Chicago N. W. Ry. Co. v. Dey, supra, in reply to a similar contention:

"But speculations as to the future are not guides for judicial action. Courts determine rights upon existing facts. Of course, there is always a possibility of the future; good crops may increase transportation business; poor crops reduce; high or low rates may likewise affect; but the only fair judicial test is to apply the rates to the business that has been done in the past, and see whether upon that basis such rates will be remunerative or compel the transaction of business at a loss." 35 Fed. 881.

A year's trial after the two-cent passenger rate had been put into effect, it is claimed by complainants, and that is the gist of their complaint, has demonstrated that the rates then in force were confiscatory, and reduced the earnings of the entire business to a point which makes them noncompensatory. If this is found to be true from the proofs, they are clearly entitled to relief. To avoid any injustice by changed

conditions in the future, as prophesied by counsel for the state, the court·has the power to retain control of the cases, with leave reserved to defendants to move the court at any time for a reinvestigation of the question of the reasonableness of these rates, as was done by Mr. Justice Brewer in Ames v. Union Pacific Railway Co., supra. Nor would a permanent injunction in these cases prevent the commission from making new rates, sufficiently low to protect the public from oppression, and yet not so low as to make them confiscatory of the investment of the roads.

## Are the Rates Confiscatory?

The matter of most importance to be determined is whether the rates, freight and passenger, in force at the time of the institution of these actions by order of the state Railroad Commission and the Legislature of the state, were so unreasonably low as to justify the court to enjoin their enforcement, upon the ground that they are noncompensatory to an extent which makes them practically confiscatory of complainants' property. To determine that question it is necessary for the court to ascertain and make findings what the investment of each road is; what its gross earnings from the intrastate traffic, freight and passenger, are; what the expenditures necessary for the proper management of the roads are; how to apportion the investment and expenditures between the intra and inter state business; what the net earnings from all the intrastate traffic are; and what would be a reasonable return on the investment.

## Investment.

By the acts of complainants the court is relieved of a very difficult problem, that of the valuation of the property. In the bills of complaint the railroads only ask for compensatory rates on the basis of valuation according to the assessment of their property for taxation by the state of Arkansas made by the State Board of Railroad Assessors. Its reasonableness is, of course, conceded by the defendants, and therefore there is no necessity for the court to determine what rules should govern in ascertaining what the investments on which complainants are entitled to a reasonable compensation are. It is proper to state here that it is agreed by the parties that the assessments for taxation in the state of Arkansas are on a basis of 50 per cent. of the real value of the property, and that these assessments were made on that basis. For this reason the assessments must be doubled to ascertain the real value of the property. The values of the two roads in this state thus assessed, when doubled, are:

Iron Mountain.................................................... $39,986,564
Southwestern .................................................... $16,023,090

## The Gross Earnings.

The next question to be determined is: What are the gross earnings from the entire business in the state of Arkansas, the expenditures therefor, and the cost of the intrastate business, as distinguished from the interstate? The facts relating to this item are undisputed,

and show the earnings of the Iron Mountain for the six months ending December 31, 1907, to be:

### Freight Revenue.

|  | Amount. | Percentage of Total Revenue in State. |
|---|---|---|
| Intrastate | $   640,248.17 | 9.59 |
| Interstate | 4,133,210.33 | 61.92 |
| Miscellaneous | 122,814.41 | 1.84 |
| Total | $4,896,272.91 | 73.35 |

### Passenger Revenue.

| | | |
|---|---|---|
| Intrastate | $   836,542.20 | 12.53 |
| Interstate | 568,176.21 | 8.52 |
| Miscellaneous | 373,785.47 | 5.60 |
| Total | $1,778,803.88 | 26.65 |
| Grand total from freight and passengers in the State of Arkansas | $6,675,076.79 | 100.00 |

The earnings for the Southwestern Railway Company for the same period are:

### Freight Revenue.

|  | Amount. | Percentage of All Earnings in State. |
|---|---|---|
| Intrastate | $   173,064.45 | 7.56 |
| Interstate | 1,597,230.02 | 69.80 |
| Miscellaneous | 25,061.02 | 1.01 |
| Total | $1,795,355.49 | 78.37 |

### Passenger Revenue.

| | | |
|---|---|---|
| Intrastate | $   246,101.33 | 10.76 |
| Interstate | 170,735.14 | 7.46 |
| Miscellaneous | 75,981.44 | 3.41 |
| Total | $   492,817.91 | 21.63 |
| Grand Total | $2,288,173.40 | 100.00 |

### Miscellaneous Earnings and Expenses.

[13] In computing the net earnings, the accountants for complainants have entirely eliminated the earnings from, as well as the expenditures for, what is termed "miscellaneous sources," neither crediting the intrastate earnings with any portion of this item, nor charging them with any part of its expenses. The explanation given for this omission is that it is impossible to suggest any method whereby this item, which arises from state and interstate traffic, can be separated or divided between them, either as to earnings or expenses. That it cannot be ascertained with mathematical accuracy is no doubt true; but neither can the apportionment of expenditures between the state and interstate or passenger and freight business be accurately ascertained. The exhibits filed by both companies specify the items which make up

these miscellaneous items, and, judging from them, the court is of the opinion that to divide them on the basis of the earnings from each source will be as approximately right as is possible without injustice to either of the parties. The court can conceive of no good reason why these earnings from miscellaneous sources should not be credited to the state business in the proportion they bear thereto, and the expenses apportioned in the same manner, and that is the best conclusion which can be reached from the evidence in these cases.

The intrastate business of the express companies is not so insignificant as to justify a finding that there is neither profit nor loss from it for the railroads, and this applies also to the earnings from carriage of the mails. The local rates for express packages are considerably higher than those for the through carriage, owing to the short haul, and the railroads receive the compensation on the basis of gross earnings of the express company. From the evidence in this record the court is of the opinion that the earnings from express traffic are, if anything, more profitable than from the passenger traffic, while mail probably yields a smaller net profit; but upon the whole all of the items classed as "miscellaneous earnings" will yield as much revenue as other sources of transportation. The court therefore holds that the miscellaneous earnings should be credited to the other earnings, and, as there is no evidence in the record which will enable the court to divide them with mathematical exactness between the state and interstate earnings, they will be apportioned on the revenue basis, which will be as near correct as any other basis which can be adopted from the evidence in this record.

## Omitted Earnings.

[14] The next items to be considered for the purpose of determining the earnings of complainants are those which counsel for the state claim are omitted from the statements filed by the Iron Mountain Railroad Company, but are properly chargeable to it. The evidence establishes the fact that, as a part of the consideration for the exclusive privilege granted to the Pacific Express Company, the Missouri Pacific Railway Company, which is the owner of the entire capital stock of the Iron Mountain Railway Company, and therefore in absolute control thereof, received $2,400,000 of the express company's capital stock or 40 per cent. of the entire capital stock. This was paid to them without any other consideration, so far as the evidence shows.

There is a further provision in the contract that this capital stock shall not be increased above $6,000,000 without the consent of the railway company, which would indicate that, if there is an increase of the capital stock of the express company, the railway company will be entitled to 40 per cent. of this increase, without paying any other consideration therefor than the privileges granted by the contract. It recites:

"The said second party [the express company], in consideration of this contract and the rights and privileges accorded by it, agrees to give to the said party of the first part $2,400,000 of its capital stock (and it is agreed that the capital stock of the second party shall not be increased above $6,-000,000 without the consent of the first party)."

The evidence also establishes the fact that the Missouri Pacific Railway Company receives now, and for years has received, from the express company, an annual dividend of 6 per cent. on this stock, amounting to $144,000 annually. Whether any larger earnings have been placed to the surplus, and the value of the stock thus increased, does not appear from the evidence. Although the express company, under this contract, enjoys the exclusive privilege over the Iron Mountain road, no part of this annual dividend, which is a part of the consideration, is credited to that road. As the contract expressly provides for the privilege of the railroad company to have the exclusive right on all trains from St. Louis to Texarkana, which is the exclusive territory of the Iron Mountain Railway, controlled by the Missouri Pacific Railway, and also covers all lines "owned, operated, and controlled by the Missouri Pacific Railway," which includes all other branches of the Iron Mountain Railway, the latter is clearly entitled in a court of equity to its pro rata share of this annual dividend; for in equity the Missouri Pacific Railway holds that stock as trustee for itself and its subsidiary lines. There is no evidence in this record that any other lines are interested in this contract, except the Missouri Pacific and the Iron Mountain Railways; nor is there any evidence, other than the mileage owned and operated by these two roads, which could serve as a basis for division. The court, therefore, adopts the mileage of the two roads as the proper basis. The mileage of the Missouri Pacific Railway and lines operated by it is 3,491.68 miles, and that of the Iron Mountain 2,599.15 miles—a total of 6,090.83 miles. Of the Iron Mountain mileage, 1,355.09 miles are in the state of Arkansas. Upon this mileage basis the Iron Mountain is entitled to receive of this dividend $31,968 for the state of Arkansas for the year, and for six months to one-half of that sum, amounting to $15,984, to be divided between the state and interstate business as other passenger revenues derived from miscellaneous sources are apportioned.

[15] It is next claimed that the hotel, dining room, saloon, lunch stand, and checking privileges in the Union passenger station at Little Rock, although of an annual rental value, as shown by the evidence, of $4,200, have been granted to the occupants for the nominal rental of $1 per annum. While there can be no doubt that the company has a right, in so far as it alone is concerned, to give away any of its property, in a controversy of this nature, involving the claim that the revenues derived from its business in the state, under the tariffs fixed by the state, is so small as to make them confiscatory, it cannot be permitted to do so, and should be charged with the reasonable value of its property, which, by its permission, is used by others, not for the benefit of the railroad, but for their individual profit. If by charging the value of these privileges, or any other matters which the law permits the carrier to charge for, the earnings on the rates fixed by the state are shown to be compensatory, it has no right to complain, and insist upon higher rates to enable it to act generously toward favorites. Generosity cannot be practiced at the expense of justice, nor should it be permitted to be dispensed at the cost of others. No evidence has been offered by the company to explain why these valuable privileges

are given away. No consideration of any kind is shown to have passed to the company therefor. The evidence shows that the expense of repairs and preserving the premises in proper condition is also borne by the railway company. The finding must therefore be that this generosity ought not to be charged to the people of the state, but the loss must be borne by the railway company. Neither the statutes nor orders of the commission require it to give this or any of its other property away. It had a right, and it was its duty, so far as its claim in this cause is affected thereby, to charge and collect the fair value thereof. Knoxville v. Water Co., 212 U. S. 1, 12, 29 Sup. Ct. 148, 53 L. Ed. 371.

The reasonable rental value of these premises is found by the court from the evidence to be $4,200 per annum, and for six months amounts to $2,100, which should be added to the miscellaneous earnings from passenger traffic in the state, to be properly apportioned between state and interstate earnings on the same basis as other miscellaneous passenger earnings are divided.

It is also claimed by the state that the Bunch Elevator was the property of the Iron Mountain Company, and its rental value $20,000 a year, but was rented to the Bunch Company for the nominal sum of $1 per annum. There is no evidence to warrant a finding that the elevator was the sole property of the railroad company at that time. The only testimony on that point is that the records of the railway company show that $1 per annum is received for the rental; but whether that is for the use of the right of way of the railway company on which the elevator stands, or for the elevator itself, is nowhere shown. In another proceeding had in the bankruptcy court for this district it appeared that the Bunch Company was the real owner of that elevator, and the railroad company, since the institution of this suit, purchased it from the trustee in bankruptcy of the Bunch Company, with the approval of the court, paying therefor the sum of $93,-665 to the trustee in bankruptcy of the Bunch Company. Although this fact was not put in evidence in this case, still, as there is no evidence which the court feels would warrant it to make a finding that the railroad company was the owner of the elevator and that its rental value is as claimed, the court finds that this claim of the state cannot be sustained.

Another claim made by the state is that among the expenses charged to the business of this state there is an item for repairs of all the tools and machinery in the shops of the railway company at Argenta, Ark., although the repair work there is not limited to the cars of the Iron Mountain, but includes cars of the entire Missouri Pacific system. The amount charged to the state of Arkansas on this account is $48,-671.67, or 77 per cent. of the entire amount paid out at that shop for the repairs of these tools. It is claimed that this large sum is expended at the Argenta shops, because they are the largest of the entire system. The other shops are in Missouri and Kansas; but they are much smaller. There are also some other small repair shops on other parts of the system. There is nothing in the evidence to indicate what

would be a proper sum to be charged; but it is claimed that, as this state is charged on equipment with only 55 per cent. of the cost of repairs, the charge on this item should be no higher. The evidence shows that the cars requiring repairs are usually sent to the nearest shop, and as many of the cars of the Missouri Pacific equipment, when needed, were used on the Iron Mountain Railway, these cars, when in need of repairs, were sent to the Argenta shops. There is no claim that the cost of the repairs of the cars is not properly divided between the two systems; but the cost of the repairs of the tools, it is claimed, is not. It is shown by the testimony introduced on the part of the railway company that 90 per cent. of the cost of the repairs of these tools is caused by repairs of locomotives, and these all belong to the Iron Mountain Railway Company, and none to the Missouri Pacific Railway. There would, therefore, be only 10 per cent. of this amount which would be improperly charged. The difference would only be 22 per cent. of this 10 per cent., and, when divided into the six months period, would leave the amount so insignificant, less than $150, that the net earnings can hardly be said to be affected by it.

Objections are also made by the state to the item, among the expenses, of a fine imposed on the Iron Mountain Railway by a court of this state for a violation of the law prohibiting the giving of free passes to members of the Legislature. The evidence fails to show whether this was done with the knowledge or approval of the higher officials of the company, or by the inferior officials, for whose acts the company is, under the statute, responsible. As there is no presumption of an unlawful intent, in the absence of proof, the court is not inclined to sustain this claim, without determining whether it could under any circumstances be sustained.

Objections are also made to the expenses of the Memphis and Ft. Smith terminals charged entirely to the Arkansas business, although all of the Memphis business being in the state of Tennessee is interstate, and a very considerable part of the Ft. Smith traffic is of that nature, and all the earnings are credited to interstate business. The uncontradicted evidence shows that the Memphis terminal, which is the terminal point of that branch of the Iron Mountain, is used exclusively for the Arkansas business, and differs in no respect from what would be incurred if it were in this state, on the west side of the Mississippi river, instead of being in Memphis, on the east side of that river. This also applies to the Ft. Smith terminals, in so far as the Arkansas business is concerned; the Oklahoma business being charged to that state, with its proportion of expense. These matters will be considered and allowance made therefor when considering the apportionment of expenses between the state and interstate business, and thus the injustice to the intrastate business rectified.

Another claim is that the state of Arkansas is charged with part of the salaries paid to Messrs. Phelps and Seibert, shown by the accounts of the Iron Mountain to have been connected with the legal department at the headquarters in the city of St. Louis, Mo., and of Mr. Cox, who was during the year 1907 residing at Little Rock. It is claimed on the part of the state that the services of these parties were

for lobbying, and therefore not a proper charge. But there is no evidence to sustain the claim that the salaries were paid for such services. The failure of the railway company to show what the services were for which they were compensated does not justify the court in finding, upon a mere suspicion, that they were for services which are unlawful and against public policy. The burden to prove an unlawful act is upon the party charging it, and will not be presumed, in the absence of evidence to that effect.

The rentals paid by the Iron Mountain Railway for the use of the Van Buren bridge of the St. Louis & San Francisco Railway Company, and for the use of the tracks of the Southwestern Railway from Paragould, Ark., to the Missouri state line, both being used solely for interstate traffic, it is claimed by the state that no part of that expense should be charged to the intrastate business. The court finds from the evidence that while the intrastate business makes no use of these facilities, and therefore obtains no direct benefit from them, the indirect benefits, by relieving the tracks of the company of the interstate trains using these leased facilities would make it inequitable not to charge it with its proportion. The amounts involved are comparatively small, still that fact alone would not prevent the court from making allowance therefor, if, in its opinion, it would be equitable to do so.

[16] It is also claimed that the intrastate business should not be charged with any of the expense of commercial agents and solicitors employed by the railway companies in different sections of the country, because, the contention is, they only solicit interstate business. But the evidence on the part of the railway companies shows that indirectly the intrastate business receives its full share of the business obtained through these agents. If a theatrical company, intending to come to Arkansas, is induced to come over that road into the state, it will then continue to use that road for its intrastate trips to other cities in the state. Also, new industries and homeseekers induced by the efforts of these men to locate in this state add materially to their intrastate business. For these reasons the court is of the opinion that the state business is properly chargeable with its proportion of that expense.

Some other matters of this nature, involving small amounts, have been presented by the learned counsel for the state. They were each and every one carefully considered, and are disallowed. To state them, and the reasons for the conclusions reached, would make this opinion too lengthy, and the amounts involved are too small to justify it.

The items which the court finds should be charged to the companies and added to the miscellaneous earnings of the passenger service of the Iron Mountain Railway for the six months period are: For dividend from Pacific Express Company, $15,984; rents from passenger station at Little Rock, $2,100—a total of $18,084, making the total of miscellaneous earnings from passenger revenue $391,869.47. By adding these sums to the other passenger revenue, it naturally changes the percentages to some extent. As changed they will be as follows:

Passenger Revenue.

|  | Amount. | Percentage of Passenger Revenue |
|---|---|---|
| State | $ 836,542.20 | 46.55 |
| Interstate | 568,476.21 | 31.08 |
| Miscellaneous | 391,869.47 | 22.37 |
| Total passenger earnings | $1,796,887.88 | 100.00 |

Dividing the miscellaneous earnings between state and interstate upon that basis, the result is:

|  | Passenger Revenue. | Per Cent. | Miscellaneous. | Total. |
|---|---|---|---|---|
| State | $ 836,542.20 | 59.54 | $233,318.80 | $1,069,861.00 |
| Interstate | 568,476.21 | 40.46 | 158,550.67 | 727,026.88 |
| Total | $1,405,018.41 | 100.00 | $391,869.47 | $1,796,887.88 |

Dividing the miscellaneous of the freight earnings between the state and interstate, we have the following results:

|  | Freight Revenue. | Per Cent. | Miscellaneous. | Total. |
|---|---|---|---|---|
| State | $ 640,248.17 | 13.41 | $ 16,469.41 | $ 656,717.58 |
| Interstate | 4,133,210.33 | 86.59 | 106,345.00 | 4,239,555.33 |
| Total | $4,773,458.50 | 100.00 | $122,814.41 | $4,896,272.91 |

This makes the total earnings of the Iron Mountain Railway in the state of Arkansas for the six months ending December 31, 1907, $6,-693,160.79.

Making the same division of the miscellaneous for the Southwestern Railway for the six months ending December 31, 1907, the result is:

Passenger Revenue.

|  |  | Per Cent. | Miscellaneous. | Total. |
|---|---|---|---|---|
| State | $ 246,101.33 | 59.04 | $44,859.44 | $ 290,960.77 |
| Interstate | 170,735.14 | 40.96 | 31,122.00 | 201,857.14 |
| Total | $ 416,836.47 | 100.00 | $75,981.44 | $ 492,817.91 |

Freight Revenue.

|  |  | Per Cent. | Miscellaneous. | Total. |
|---|---|---|---|---|
| State | $ 173,064.45 | 9.78 | $ 2,450.97 | $ 175,515.42 |
| Interstate | 1,597,230.02 | 90.22 | 22,610.05 | 1,619,840.07 |
| Total | $1,770,294.47 | 100.00 | $25,061.02 | $1,795,355.49 |

Total earnings of Southwestern in the state of Arkansas for the six months period ending December 31, 1907, $2,288,173.40.

## Apportionment of Valuation of Property.

[17] What basis should be adopted for the purpose of apportioning the valuation of the property to each of the two classes of earnings, the state and interstate, in order to enable the court to determine whether the earnings of the railroads from its intrastate business under the rates established by the state Railroad Commission are compensatory? As the issues in these cases involve the entire intrastate

business in the state of Arkansas, freight as well as passenger, it is immaterial how the valuation of the property is apportioned between the freight and passenger service. After ascertaining the proportionate net earnings from all sources of the intrastate business, it can be ascertained what they yield on the entire investment, as apportioned between the state and interstate business, and the main issue involved, whether the rates are compensatory or confiscatory, satisfactorily determined.

On the part of complainants it is claimed that the revenue basis, pure and simple, should be adopted for that purpose, because it is claimed that values of railroad property, like all other property, depend to a great extent upon its producing capacity and net earnings. On the other hand, it is claimed that the division should be made on the basis of the ton mileage, because that is the use to which the property is put; and it is urged that the higher the rates for intrastate traffic are the greater will be the proportion of the valuation charged to that part of the earnings, or, in the language of the learned counsel:

"When they use the revenue to divide the property, instead of using the ton miles, and the ton mileage is the expression of the use of the property, they have assigned 90 per cent. more—that is, the relation that 7 bears to 13 per cent.—to the state business upon which they expect to earn a return. * * * When they have divided the property on a revenue basis, it takes almost double the use of the property. They have assigned 90 per cent. more property to state use than it actually uses, in addition to assigning 100 per cent. on account of the double amount of state business revenue per ton per mile over interstate."

In estimating the value of property, its net income, if not the most important, is certainly a very important, factor. A building in New York City is valued much higher than a building exactly like it, and the erection of which cost the same price, situated in Little Rock. The reason therefor is that the income from its rentals is much higher in the former city than in the latter. So a building in Little Rock, or any other city, on its main business street, is of much greater value than if standing in the suburbs, although both buildings may be exactly alike, put to the same uses, and cost the same. That the same rule should and does apply to railroads is shown by the market value of the stocks. While the share of a railroad whose earnings enable it to pay a 6 per cent. dividend annually will command a premium on its face value, those of a railroad earning no dividends, and whose income is barely sufficient to earn the fixed charges, are practically worthless, or will sell for a very low price, and that only on speculative grounds.

Take two roads, one in a level country, with practically no grades, inexpensive to maintain, and constructed, by reason of these facts, at a low cost, while another road, built in a mountainous, rocky country where it was necessary to do a great deal of expensive blasting of rock, building tunnels, with heavy grades and many curves. The latter road cost probably three or four times as much to build as the former, yet, owing to the level grades, absence of sharp curves, and more productive lands along its line, the earnings of the former are much greater than of the latter. Not only that, but, owing to the grades, the one road can carry only half as many cars as the other.

The consumption of fuel, and added to these the greater outlay for wages to employés, cause expenses to be so great as to leave small net earnings for that road whose cost was greatest, while the net earnings of the other are sufficient to pay large dividends. Can there be any doubt that the value of the first will be much greater than the latter, and that its shares will sell for a much higher price? The value of every investment or property is measured, to a large extent at least, by the value of its use, not by its use divorced from its value. The value of a railroad for taxation, it has been uniformly held by the courts, may properly be determined by the value of its bonds and stocks. Without citing the numerous cases decided by the courts, both state and national, approving this method of assessing railroad, telegraph, and other property of this nature, the following may be referred to: State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663; Kentucky Railroad Tax Cases, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414; Western Union Telegraph Co. v. Massachusetts, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790; Pullman Co. v. Pennsylvania, 141 U. S. 18, 11 Sup. Ct. 876, 35 L. Ed. 613; Columbus, Southern Railway Co. v. Wright, 151 U. S. 470, 14 Sup. Ct. 396, 38 L. Ed. 238; Pittsburgh. etc., R. R. Co. v. Backus, 154 U. S. 421, 14 Sup. Ct. 1114, 38 L. Ed. 1031; Adams Express Co. v. Ohio, 166 U. S. 186, 17 Sup. Ct. 604 (41 L. Ed. 965), where the court said:

"Whatever property is worth for the purpose of income and sale, it is worth for the purpose of taxation."

And this is the rule sanctioned by the Supreme Court of Arkansas. Wells Fargo Express Co. v. Crawford County, 63 Ark. 576, 40 S. W. 710, 37 L. R. A. 371.

This is evidently the rule recognized and acted on by the railroad assessing board of the state of Arkansas, as shown by the evidence in this case. The main line of the Iron Mountain Railroad is practically a water-level road—no mountains to cross, no rocks to blast or tunnels to excavate, and the leading commercial cities and industries of the state along its line. On the other hand, the White River branch of that road was the most expensive road ever constructed in the state. Miles of it had to be cut out of rock, and tunnels cut through rocky mountains. There are no large cities along its line, and the country but sparsely settled. Owing to the heavy grades and the many curves, made necessary by the topography of the country, it cannot possibly carry as many cars to a train and transport freight as economically as the main line. The state officials, charged by law with the duty of assessing the property, must have taken these facts into consideration when they assessed these railroads. The White River branch, in spite of its great cost, was in 1907 valued by that board at $19,000 per mile, and assessed on the basis of 50 per cent. of its value at $9,500, while the main line was valued at $45,000 per mile, and assessed at 50 per cent. of that sum, at $22,500 per mile.

For these reasons, the earning capacity of a railroad is the most important factor to be taken into consideration in determining its value. As shown above, it has been taken into consideration by the assessing officers of the state, and should be taken into consideration

for the purpose of determining the apportionment of values in this case. If, by reason of the higher rates allowed by the state tariff, the net earnings of the property are increased, the value of the property is correspondingly increased, and the assessment for taxation made accordingly. The proportions assignable to the intrastate business in the state, based upon the assessments of 1907, for the six months ending December 31, 1907, are:

Iron Mountain.................................................$5,158,266.56
Southwestern ................................................$1,634,350.00

### Bases for Apportionment of Expense.

[18] The most important and serious problem to be determined is the basis to be adopted for apportioning the expense between the inter and intra state business. Smyth v. Ames, 169 U. S. 466, 541, 18 Sup. Ct. 418, 42 L. Ed. 819, has conclusively established as a rule of law that:

"The reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control."

It is therefore absolutely necessary to determine how these expenses should be apportioned between the two classes of earnings without injustice to either party. All parties agree that there are no fixed bases which will enable the court or the most experienced railroad statistician to make that apportionment with mathematical accuracy. All that can be done is to adopt those bases which will come nearest being right. As stated by Mr. Justice Brewer, in Chicago, etc., Ry. v. Tompkins, 176 U. S. 167, 178, 20 Sup. Ct. 336, 340, 44 L. Ed. 417:

"If the court meant simply that it could not determine that fact [the actual cost of the local earnings] with mathematical accuracy, basing it upon testimony of the exact amount of money paid out for doing such work, it is undoubtedly true; but there are many things that have to be determined by court and jury in respect to which mathematical accuracy is not possible. Take the ordinary cases of condemnation of real estate. * * * Such testimony is not to be disregarded simply because it cannot demonstrate by figures the exact amount or per cent. of the extra cost. It is obvious on a little reflection that the cost of moving local freight is greater than that of moving through freight, and equally obvious that it is almost, if not quite, impossible to determine the difference with mathematical accuracy."

The first matter to be considered is what theory to adopt. Couι. el, as well as accountants, statisticians, and railroad men of experience, differ as to which one should be adopted. On the part of complainants, it is claimed that the straight revenue basis furnishes an approximately correct result of the net earnings of each class of traffic, and no other will come as near it. On the other hand, the contention on the part of the state is that for freight the ton mile basis, and for passenger earnings the passenger mile basis, will produce the more correct results. The train mile basis is conceded by all as the least accurate.

This question is not raised for the first time in these cases. It seems to have been considered as an important factor in every rate

case, and has perplexed other courts as much as it has this. The authorities on the subject are anything but harmonious, although the largest number of decisions, especially of the national courts, favors the contention of complainants. But a careful consideration of the facts in each case, and the various methods employed to reach results, shows that neither of them will produce approximately correct results, if no other factors are taken into consideration.

The straight revenue theory, as advanced by the learned counsel and accountants of the railroads, is clearly wrong, as none of them takes into consideration the increased rates charged for the intrastate traffic. No further proof of the fallacy of this theory is required than the examples and calculations of the accountants for the railroads in the exhibits filed with their testimony. Mr. Nay, who, at the time he testified, had 37 years' experience as a railroad accountant, having begun as a clerk of statistics, and was, at the time his testimony in these cases was taken, the comptroller of the Chicago, Rock Island & Pacific Railway Company, one of the great railroad systems of the country, gave the following illustration for the purpose of establishing the correctness of his theory, and to controvert, as he states, "an argument which is sometimes used to the effect that using the revenue basis is like traveling in a circle, and those who take that position claim that, when the revenue of intrastate traffic is doubled, the operating expenses are also doubled, and the end is just the same as in the beginning." He thereupon gives the following illustration to demonstrate the fallacy of that argument, as he states:

"First, take, for illustration, a small railroad, with freight operating revenue of $100,000 and freight operating expenses of $80,000, of which the intrastate freight traffic is $25,000, and the interstate freight traffic is $75,000. We have the following statement:

|  | Intrastate. | Interstate. | Total. |
|---|---|---|---|
| Operating freight revenue........... | $25,000.00 | $75,000.00 | $100,000.00 |
| Operating freight expenses, divide the expense between the intrastate and interstate on a revenue basis, and it would be as follows:........... | 20,000.00 | 60,000.00 | 80,000.00 |
| Net operating freight revenue....... | $ 5,000.00 | $15,000.00 | $ 20,000.00 |

"Suppose that the rates on intrastate freight traffic are increased, so as to exactly double the intrastate freight revenue, leaving the interstate freight revenue just the same, and the operating freight expenses exactly the same —an impossible condition in actual practice, but the extreme condition is used, in order to emphasize the error of the argument that doubling the intrastate revenue in such a case would double the interstate expenses. After doubling the intrastate freight revenue just mentioned, we would have the following statement:

|  | Intrastate. | Interstate. | Total. |
|---|---|---|---|
| Operating freight revenue........... | $50,000.00 | $75,000.00 | $125,000.00 |
| Operating freight expenses to intrastate revenue, nearly 40 per cent. of the total revenue, the operating expenses of $80,000 divided on the revenue basis would now be........... | 32,000.00 | 48,000.00 | 80,000.00 |
| Net operating freight revenue....... | $18,000.00 | $27,000.00 | $ 45,000.00" |

187 F.—21

From this it will be seen that, although the intrastate freight earnings were increased $25,000 after the intrastate tariff rates had been raised 100 per cent. without any increase in expenditures, in the final result it is the beneficiary to the extent of $13,000 only, while the interstate earnings, with no increase in these rates, increased $12,000.

Mr. R. E. Kimbell, the auditor of one of the complainant railroads, was requested to make a similar calculation, and the result was the same as that of Mr. Nay. His calculations are filed as Exhibit 23 to his deposition.

That such a rule cannot be adopted was clearly shown by Mr. Justice Brewer, in Chicago, Milwaukee &·St. Paul Ry. Co. v. Tompkins, where, speaking of such a contention, he said:

"But that there was some fallacy in this reasoning would seem to be suggested by the fact that, although the defendants' schedule would have reduced the actual receipts 15 per cent. on the passenger and 17 per cent. on the freight business, the earning capacity for the last year was diminished only one-tenth of 1 per cent. Such a result indicates that there is something wrong in the process by which the conclusion is reached. That there was can be made apparent by further computations, and in them we will take even numbers as more easy of comprehension. Suppose the total value of the property in South Dakota was $10,000,000, and the total receipts both from interstate and local business were $1,000,000, one-half from each. Then, according to the method pursued by the trial court, the value of the property used in earning local receipts would be $5,000,000, and the per cent. of receipts to value would be 10 per cent. The interstate receipts being unchanged, let the local receipts by a proposed schedule be reduced to one-fifth of what they had been, so that, instead of receiving $500,000, the company only receives $100,000. The total receipts for interstate and local business being then $600,000, the valuation of $10,000,000, divided between the two, would give to the property engaged in earning interstate receipts in round numbers $8,333,000, and to that engaged in earning local receipts $1,667,000. But, if $1,667,000 worth of property earns $100,000, it earns 6 per cent. In other words, although the actual receipts from local business are only one-fifth of what they were, the earning capacity is three-fifths of what it was. And, turning to the other side of the problem, it appears that, if the value of the property engaged in interstate business is to be taken as $8,333,000, and it earned $500,000, its earning capacity was the same as that employed in local business, 6 per cent. So that, although the rates for interstate business be undisturbed, the process by which the trial court reached its conclusion discloses the same reduction in the earning capacity of the property employed in interstate business as in that employed in local business, in which the rates are reduced." 176 U. S. 176, 20 Sup. Ct. 339 (44 L. Ed. 417).

On the other hand if the ton mile basis is adopted for the division of the operating expenses between inter and intra state earnings, without considering the additional expenses of the local business which it is conceded by all exists although they differ as to the percentages the result would be just as far wrong as the other. But if proper allowances are made for the higher rate received for local business and also for the increased cost of the local business as it appears from the evidence, it is wholly immaterial which of these two theories is adopted, whether the revenue or the ton mile basis, as the results will be the same. As an illustration of the correctness of this statement the following example will serve:

Adopt as factors that the entire earnings in the state from freight are $2,000,000, and that $750,000 of that was realized from 75,000,000 ton miles of intrastate freight, and $1,250,000 from 250,000,000 ton

miles of interstate business, thus showing that from the intrastate business the earnings were 1 cent per ton mile and from the interstate business 5 mills per ton mile. The articles carried, it is assumed, are practically the same. The cost of the entire business was $1,500,000, and the cost of the local business is 200 per cent. greater than that of the through business. The calculations on these factors on the revenue and ton mile bases were made by the accountants of the railroads and the state, and are as follows:

Calculations made by accountants of the railroads:

### Revenue Basis.

|  | Amount. | Per Cent. | | |
|---|---|---|---|---|
| Intrastate | $ 750,000 | 37.50 x 1½=56.25 | | 47.37 |
| Interstate | 1,250,000 | 62.50 | 62.50 | 52.63 |
|  | $2,000,000 | 100.00 | 118.75 | 100.00 |

The total expenditures of $1,500,000, divided upon these percentages and deducted from the gross earnings, will result in the following net earnings:

|  | Intrastate. | Interstate. | Total. |
|---|---|---|---|
| Gross revenue | $750,000 | $1,250,000 | $2,000,000 |
| Operating expenses | 710,550 | 789,450 | 1,500,000 |
| Net earnings | $39,450 | $460,550 | $500,000 |
| Ton miles | 75,000,000 | 250,000,000 | 325,000,000 |
| Cost per ton mile | 9.474 | 3.158 | 4.615 |

### Ton Mile Basis.

|  | Amount. | Per Cent. | | |
|---|---|---|---|---|
| Intrastate | 75,000,000 | 23.08 x 3=69.24 | | 47.37 |
| Interstate | 250,000,000 | 76.92 | 76.92 | 52.63 |
| Total | 325,000,000 | 100.00 | 146.16 | 100.00 |

|  | Intrastate. | Interstate. | Total. |
|---|---|---|---|
| Gross revenue | $750,000 | $1,250,000 | $2,000,000 |
| Operating expenses | 47.37 | 52.63 | 100 |
|  | $710,550 | $ 789,450 | $1,500,000 |
| Net earnings | $ 39,450 | $ 460,550 | $ 500,000 |

|  | Intrastate. | Interstate. | Total. |
|---|---|---|---|
| Ton miles | 75,000,000 | 250,000,000 | 325,000,000 |
| Cost per ton mile | 9.474 | 3.158 | 4.615 |

## Calculations made by accountants for the state:

### Revenue Basis.

|  | Intrastate. | Interstate. |
|---|---|---|
| Interstate, 62.5 per cent., at 5 mills per ton mile; intrastate, 37.5 per cent., at 1 cent per ton mile | $750,000 | $1,250,000 |
| Expenses (state costing 200 per cent. more than interstate, or three times as much as interstate, on ton mile basis, thus allowing 200 per cent. greater cost on ton mile basis): Interstate, 52.63 per cent., at $.003158 per ton mile; intrastate, 47.37 per cent., at $.009474 per ton mile | 710,550 | 789,450 |
| Net earnings on this basis | $ 39,450 | $460,550 |

Ton Mile Basis.

Interstate, 62.5 per cent., at ½ cent per ton mile; intrastate, 37.5 per cent., at 1 cent per ton mile.....$750,000   $1,250,000
Expenses (state costing 3 times as much as interstate per ton mile): Interstate, 52.63 per cent., at $.003158 per ton mile; intrastate, 47.37 per cent., at $.009474 per ton mile........................ 710,550   789,450

Net earnings on this basis........................$ 39,450   $460,550

The same result is reached by applying to the ton mile basis the rule laid down by Mr. Justice Van Devanter when the temporary injunctions in these cases were granted by him.

Tonnage per Ton Mile.

Interstate ........................250,000,000     250,000,000
Intrastate ........................ 75,000,000 x 3=225,000,000

Total ........................     475,000,000 ton miles.

Dividing the $1,500,000 expense by the sum of 475,000,000 shows the cost per ton mile to be $.003158.

Interstate .............................250,000,000 x $.003158=$789,450
Intrastate .............................225,000,000 x $.003158=$710,550

Deducting these sums from the earnings leaves:

| | Earnings. | Expenses. | Net Earnings. |
|---|---|---|---|
| Interstate | $1,250,000 | $ 789,450 | $460,550 |
| Intrastate | 750,000 | 710,550 | 39,450 |
| Total | $2,000,000 | $1,500,000 | $500,000 |

From this it clearly appears that a great deal of this voluminous testimony of the accountants for both parties as to what theory should be adopted, and the elaborate argument of counsel on that question, need only be made use of for the purpose of ascertaining some of the items which will show the difference of cost between the two classes of traffic. For that purpose the testimony on the difference of cost, as well as difference in rates, will have to be carefully considered, and the findings will determine how the apportionment should be made.

While the evidence is of such a nature that, whatever conclusions the court may reach, they will not be mathematically accurate, it differs in no respect from other uncertain questions of fact which have to be determined by a court or jury, as stated in the excerpt from the Tompkins Case hereinbefore copied. But to ascertain the cost of the different items of expense it is impossible to adopt either theory to the exclusion of the others in all matters. For some items the revenue theory will necessarily have to be adopted, while in others the ton mileage, car mileage, or train mileage are the only bases which will enable the court to determine from the evidence in these cases how the different items of expenditures should be apportioned. After ascertaining the difference of the cost of expenditures and the difference in the rates between state and interstate transportation, the final determination of what the net earnings of each road on its intrastate business are can be as correctly ascertained by adopting the revenue as the ton mile basis.

## Inter and Intra State Tariff Rates—Freight.

Whether the ton mile, car mile, train mile, or revenue basis is adopted to arrive at correct results, it is necessary to ascertain the relation of the tariff rates charged for the interstate business and those charged for the intrastate business; for, if the latter are sufficiently high to make up the difference in cost found to exist between the two, then that difference has been fully provided for, and to make any additional allowance therefor would be doubling the cost, and to that extent doing an injustice to the state. Or, in other words, if the evidence shows that, while the interstate earnings are compensatory, the intrastate rates are so low as to make them noncompensatory, and if it is shown that the difference in cost of the two classes of traffic is 100 per cent., but that the rates for the intrastate are 100 per cent. higher than those charged by the roads for the through traffic, then there would be no cause for inference by the courts. That the interstate rates are too low is not claimed in these cases; the intrastate rates being the only ones complained of. In fact, it is shown by the evidence that the net earnings of the entire Iron Mountain System were sufficient to pay for the year 1907 and for several years prior thereto a dividend of 10 per cent. on its capital stock, after paying the interest on its bonded indebtedness.

Taking up the freight tariffs first: It is claimed on the part of the state that the rates charged for the state business exceed those for the through business on the Iron Mountain 98 per cent., the earnings for the local business being 13.377 mills per ton mile, and for the through business 6.75 mills; and on the Southwestern they exceed 141 per cent., the earnings for the local business being 20.945 mills and for the through 8.665 mills for the ton mile. The statistics of the two roads, as shown by the statements filed, sustain these figures; but it must be conceded that, unless the commodities hauled in the state and through business are practically the same, these figures cannot be adopted as proper factors for the determination of that question. This is easily proven by the following simple example: If the state business carries one-half high-class traffic at 3 cents a ton mile and one-half low-class at 1 cent per ton mile, the average of the entire traffic would be 2 cents; but if it carries only 25 per cent. high-class commodities at 3 cents and 75 per cent. low-class at 1 cent, the average would at once be reduced to 1.5 cents per ton mile, a difference of 33⅓ per cent.

The heaviest tonnage in interstate traffic consists of lumber and grain, which are carried at the lowest rates. Grain constitutes 13.75 per cent. of the entire tonnage on the Iron Mountain, and something less on the Southwestern. The grain tonnage in local traffic is practically negligible. Other commodities of a low class, such as cement, salt, and iron, are transported almost exclusively in interstate traffic, while practically very few, if any, very low-class commodities are carried in local traffic to the exclusion of the through. But it is unnecessary to go into details to show that the difference in the earnings of the two traffics is largely affected by the commodities carried, and the changes in ton mile earnings at different times are caused by the

shifting of the commodities transported. In the opinion of the court this is conclusively shown by the fact that, although the rates, inter as well as intra state, of both roads, the Iron Mountain and Southwestern, as established by the Arkansas Railroad Commission, and the tariffs published by the roads for interstate business, are identical, the earnings of the Southwestern on local business are 20.945 mills per ton mile, while those of the Iron Mountain are only 13.377 mills, a difference of over 55 per cent., and on interstate business the earnings of the Southwestern are 8.665 mills and those of the Iron Mountain 6.75, a difference of 20 per cent. This difference is, in part at least, explained by the fact that the Iron Mountain carries a great deal of coal in inter as well as intra state traffic, having branches through the coal fields of the state; 22.83 per cent. of the entire state traffic of the Iron Mountain being of that character. This is carried at an average of 6 mills per ton mile, against 13.377 mills for the entire business. The Southwestern transports very little coal, practically none local and comparatively little interstate. Other low commodities carried in much larger quantities locally by the Iron Mountain than the Southwestern are stone, brick, and lumber; the local lumber carried on the main line of the Iron Mountain, and especially when reduced to ton miles, being considerably greater than on the Southwestern, owing to the fact that most of the large cities of the state are on that line, and the number of sawmills on the north half of that line in the state being few as compared with those on the Southwestern. The Arkansas standard distance tariff shows that stone, which constitutes 7.20 per cent. of the total state traffic on the Iron Mountain, was required to be carried at an average rate of 5¼ mills per ton mile; lime, brick, and cement, which constitute 6.13 per cent., were carried at the same rate. The length of the haul is another important matter to be considered; for, as the rate per mile gets lower under the state distance tariff as the distance increases, the shorter the haul the greater the revenue is per ton mile.

That the shifting of commodities is the principal cause of these differences in earnings per ton mile is further shown by the testimony of Mr. Kimbell. At the request of counsel for the state he prepared a statement (Exhibit G) of the earnings of the Southwestern for the month of January, 1909, after the temporary injunction had been granted, and the higher rates made by that road had been put in effect. This showed an increase of 96.1 per cent. of the intrastate earnings for the ton mile; but a statement prepared by him showing the revenue under the then current rates, and what it would have been under the commission rates (Exhibit 58) shows that the actual increase of the rates was only 48.18 per cent., a difference of almost 100 per cent.

It is therefore impossible to adopt these figures as proper factors for the purpose of ascertaining the difference between the two rates. The only method by which this can be ascertained with anything near accuracy is to compare the state rates as established by the State Railroad Commission with the interstate tariffs of the railroads, taking into consideration the different commodities and quantities carried in

local and through traffic. And this comparison is at best only approximately correct. The transstate rates are considerably lower than the Arkansas state rates, and they constitute 51.16 per cent. of the entire tonnage in Arkansas over the Iron Mountain, and considerably more on the Southwestern. For some commodities the interstate rates, especially between Arkansas and Louisiana and Missouri and Arkansas, are higher than the local rates. This is due to the fact that in many instances they are carried under the state tariff at commodity rates, while under the interstate tariffs they are transported at class rates. The lowest rates in the interstate (or rather transstate) traffic are those which are controlled by zones and common points; there being 2,600 common points in the state of Texas which carry the same rates regardless of distance. On behalf of the railroads it is claimed these great differences are more apparent than real. The Texas common points are explained very fully and clearly by Mr. Perkins. He says:

"In establishing the rates to this territory from St. Louis and the East, we have a peculiar condition, in that the Texas territory is entered by the transportation lines from three sides out of a possible four. The Missouri, Kansas & Texas, the Santa Fé, and the Frisco enter the state from the north; the Iron Mountain, the Cotton Belt, the Vicksburg, Shreveport & Pacific and the Texas & Pacific from the east; the Southern Pacific, the Illinois Central, and also the steamer lines from the Atlantic coast enter from the south. Denison, Tex., a point in the extreme northern part of the state, and reached by the Missouri, Kansas & Texas and Frisco, will produce the minimum haul for those two lines from St. Louis or the East; while a similar shipment to the same point of destination, handled by the Illinois Central and the Southern Pacific through New Orleans, Houston, and then north, would offer the maximum haul for that route. A shipment to Houston, Tex., routed via Missouri, Kansas & Texas, the Santa Fé, or Frisco, would offer nearly the maximum haul for shipments handled by either of these routes; while, if routed via the Illinois Central or the Southern Pacific, it would yield the maximum haul via that route. This is true in nearly all parts of the state, and indicates very largely why a blanket zone in the state of Texas is necessary. If the Cotton Belt or the Iron Mountain Railroads were the only routes by which to reach the state of Texas, the conditions would be entirely different. We could then, and would no doubt, make our rates on a graded scale, making them higher as they proceeded south or southeast through the state."

The transstate lumber business is 10 per cent. of the entire transstate, equal to over 5 per cent. of the entire tonnage. The roads only solicit that business nearest to them, and in any event it is hardly reasonable to suppose that any considerable business originating in the southern part of Texas would be given to the roads entering the state from the north, or vice versa, as the delay in the transportation, which must be considerable, would be sufficient to prevent it. Besides, the connecting lines will naturally transfer their freight to the shortest line, in order to obtain for their roads the maximum proportion possible. This also applies to the citrus movement from California, which the testimony shows is not solicited by these roads, and practically none transported over their lines; in fact, none over the Southwestern.

Mr. Watson, the assistant general freight agent of the Southwestern, in testifying to refusals to accept shipments offered to his road where, owing to river competition, the rate was too low to be profit-

able, gave the following explanation, when asked what the principle upon which traffic men act in determining when they will not solicit or take business:

"When the business is unremunerative, or will not yield a fair rate for the services we are required to perform after deducting the arbitrary we must pay."

This, he declares, is a universal rule with his road and all others. The lumber and grain zones are controlled by commercial and competitive conditions, and yield but small profits at the rates carried; but, on the other hand, cars loaded with grain from the North are loaded with lumber on the return trip, thus creating a reciprocal haul, which is an important item in the earnings of every road, and is taken into consideration by all rate makers. Besides, the low rates on lumber, enabling the mills of the far South to compete with those farther north and nearer the commercial centers, aid in the development of the country, which would otherwise remain unsettled, and thus give the roads considerable high-class traffic and create local business which otherwise would not exist. To that extent the local traffic is indirectly benefited. In addition to this, the state tariff also provides for some zones for commercial reasons, and competition necessarily compels the consideration of competitive points. In order to enable coal mine operators in the extreme western part of the state to compete with those nearer the center of the state, the state commission has made a blanket rate, applying the Coal Hill rate, which is 114 miles from Little Rock, the railroad and geographical center of the state, to all mines west of it in Logan, Franklin, and Sebastian counties, extending to the western state line, a difference of over 50 miles in some instances. It has also made the Spadra rate applicable to all coal mines on the Dardanelle & Russellville road to all points in the state north, south, and east of Little Rock. On sugar there is a blanket rate, including in those rates every road in the state, regardless of the number of roads over which it is handled, to all points 150 miles and over. Competitive points in the state take the tariff of the shortest road of necessity; for it is a rule in railroad tariffs which may be called axiomatic that the shortest road establishes the rate for all competitive roads in that territory. While the competitive points in Arkansas are not so many, still, considering the length of the hauls and the volume of business (8 per cent. only of the entire traffic on the Iron Mountain and 2.95 per cent. on the Southwestern), they are sufficiently numerous to require consideration in determining the difference in rates. A few illustrations will show what they are. The following are some of the points which are competitive, and therefore must be served by all roads at the rate fixed by the shortest road, and from Little Rock to other points in the state the differences in mileage are here given:

Camden:
    Iron Mountain .................................................. 93 miles
    Southwestern .................................................. 124.5 miles
Fordyce:
    Rock Island .................................................. 82 miles
    Southwestern .................................................. 95 miles

Warren:
   Rock Island .............................................. 86 miles
   Iron Mountain ........................................... 149 miles
Helena:
   Iron Mountain ........................................... 160 miles
   Rock Island and Arkansas Midland........................ 118 miles
Paragould:
   Iron Mountain ........................................... 163 miles
   Southwestern ............................................ 197 miles
Jonesboro:
   Iron Mountain ........................................... 147 miles
   Southwestern ............................................ 176 miles
Newport:
   Iron Mountain ........................................... 83 miles
   Rock Island ............................................. 117 miles
Texarkana:
   Iron Mountain ........................................... 145 miles
   Southwestern ............................................ 207 miles
Forrest City:
   Iron Mountain ........................................... 117 miles
   Rock Island ............................................. 88 miles
Brinkley:
   Rock Island ............................................. 64 miles
   Southwestern ............................................ 101 miles
Crossett:
   Iron Mountain ........................................... 114 miles
   Rock Island ............................................. 138 miles
Hope:
   Iron Mountain ........................................... 112 miles
   Southwestern ............................................ 173 miles
Bridge Junction:
   Iron Mountain ........................................... 146 miles
   Rock Island ............................................. 129 miles
   Southwestern ............................................ 185 miles
Texarkana to Ft. Smith:
   Iron Mountain ........................................... 208 miles
   Kansas City Southern.................................... 160 miles
Helena to Pine Bluff:
   Iron Mountain ........................................... 203 miles
   Southwestern and Arkansas Midland....................... 100 miles

As it is conceded by all parties that the longer the haul the less the expense per mile, the zones naturally increase with the length of the haul. This is fully recognized by the Arkansas Railroad Commission in its distance tariff. With few exceptions, as the distance increases the mileage rates proportionately decrease.

In the class rates the increase in the rates is made every 5 miles for the first 100 miles. When the distance is over 100 miles, the increase of rates is for every 10 and in some instances 20 miles, and over 200 miles for every 20 or 30 miles. The commodities tariff, under which the great bulk of the local business moves, with few exceptions, increases the rates every 25 miles for the first 100 miles, and if over 100 miles for every 50 miles, and on a number of commodities the zones are larger. On lumber and other forest products, for the first 100 miles, the increase in rates is every 25 miles, and over 100 miles every 50 miles. The same difference is made on packing house products and grain. On salt the same rates apply to 200 miles as to 100 miles. For forest products, rough material, when the manufactured product is reshipped over the same line bringing in the rough material, the

rates are much lower than the regular tariff. For the first 50 miles it is 2 cents per hundred, for the next 50 miles 2½ cents, for the next 50 miles 3½ cents, from 150 to 250 miles 5 cents, and over 250 miles 8 cents. As nearly all the lumber when manufactured, is reshipped, this latter rate practically applies to nearly all the rough material of forest products except that carried to the mills by the tap lines. As construed by the Supreme Court of the state, this rate also applies when the reshipment of the manufactured product is made to points outside the state of Arkansas. Chapman & Dewey Lumber Co. v. Jonesboro, L. C. & E. Ry. Co., 133 S. W. 1119.

Another important matter to be considered in this connection is the fact that the Arkansas distance tariff, in fixing the minimum weight of car loads, is on an average 40 per cent. lower than for interstate transportation. The only commodity for which the minimum is fixed at 40,000 pounds is fire brick; the only commodities at 30,000 pounds a car are common brick, sawdust, iron, staves, and stone; coal at 25,000 pounds; 18 commodities including lumber and forest products, at 24,000 pounds; and the rest, at 20,000 pounds and less. On the other hand, the average capacity of the Iron Mountain cars is 67,000 pounds, and the minimum fixed by the Western classification on through business averages 40 per cent. more than that of the state. Most of the coal cars used in interstate traffic carry 100,000 pounds. The difference between the minimum of car loads as established by the state commission and the Western classification was ascertained by the court by comparing the two item by item, and the difference of 40 per cent. in favor of the interstate is a very conservative estimate.

Taking all these matters into consideration, and after careful calculations, which it is unnecessary, if not impossible, to set out in this opinion, the finding of the court is that, altogether the intrastate freight rates in force at the time of the institution of these actions and in 1907 were 50 per cent. higher than the inter and trans state.

### Passengers.

While the rates for passengers apparently are the same for intra and inter state, the evidence shows that the actual charge for, or rather revenue from, the state business is greater, due, no doubt, to the much longer haul and competitive conditions. For the period in controversy the actual fares collected for each passenger mile on the Iron Mountain was: Intrastate, 1.929 cents; interstate, 1.865 cents—a difference of 3.48 per cent., for which allowance will be made.

### Difference in Expenses Between State and Interstate.

That there is a material difference between the expense of state and interstate business is conceded by all. On the part of the state it is claimed this difference is not exceeding 87 per cent., while on the part of the railroads the contention is that it is much greater. This 87 per cent. is the result of the calculations after deducting the share with which the interstate traffic is chargeable for its proportion of the freight carried on local trains. The actual difference between the

expense of local and through trains per ton mile, as calculated by the state's accountants, and testified by Mr. Hamilton, is 162.67 per cent. But it is claimed, as a large proportion of the freight transported on local trains is interstate, that part of it should be charged with its proportionate share of this additional cost, and when that is done the actual difference in cost it is claimed is 87 per cent. The lowest estimate made by any witness for complainants seems to be that it is at least 200 per cent. greater, while some estimate it as much as 700 per cent.

The witnesses for the railroads do not base their opinions upon itemized statements, as no records were kept by either of the roads, for the purpose of dividing the expenses between the state and interstate business; but as all these witnesses are men who have been engaged in railroad work and connected with railroads from their earliest manhood, starting at the bottom of the ladder and now occupying most responsible positions, some as general managers, comptrollers, auditors, superintendents, and other high positions, it is claimed that their testimony, based upon their great experience, should be controlling. These witnesses for the railroads all agree on the one point: That to divide these expenses on any other than the revenue theory would not give accurate results; that their practical experience enables them to determine from a given state of facts the difference of cost between state and through business on percentages as nearly correct as it is possible to arrive at, unless separate accounts of the expenditures had been kept, not only for the inter and intra state business, but also the transstate.

On the other hand, the accountants for the state offered in evidence schedules which they claim are based on facts as they appeared from the records of the railroads when such were obtainable, and on the experience of men long in the railroad service when factors had to be adopted arbitrarily. The scheme for obtaining these facts is new, never having been used by any accountants in any of the numerous rate suits which have heretofore been before the courts. It was devised by Mr. Wharton, a member of the firm of Haskins & Sells, expert accountants of national reputation. Mr. Wharton himself testifies frankly that he has had no practical experience in the management of any work on railroads; that his knowledge of railroad accounting is limited to what he acquired from his connection as one of the accountants for the state of Missouri in the railroad rate litigation of that state and the testimony of the expert railroad men who testified in those cases; that he also consulted with railroad men of experience, and from the knowledge thus acquired he has evolved the scheme now presented to the court on behalf of the state. Who the railroad men whom he consulted are, or what their experience at that time was, what positions they had ever occupied with railroads, he fails to state, except that Mr. Hamilton, who is one of the accountants employed by his firm, and under whose supervision most of the work offered in evidence was conducted, had for a number of years been in the employ of railroads. Mr. Hamilton, who

was present at the protracted hearing of this case and explained to the court many of the items in the statements filed as exhibits for the state, impressed the court as a man of ability, a fine accountant, and a fair and frank witness.

In this connection it is but proper for the court to say that all the witnesses in these cases impressed the court as having testified as intelligently and as fairly as is possible. It is true they differ widely in their views; but it is an acknowledged psychological fact that the opinions entertained for years by a man cannot be discarded at once, and that all persons are to a certain extent influenced in their views by their environments, as well as the duties they are called upon to discharge for others.

But the experience of Mr. Hamilton in connection with the management of a railroad, when compared with that of the witnesses introduced for the complainants, is very limited. At the age of 15 he began as a messenger boy for a railroad, and continued in different positions until 1906, when at the age of 32 he entered the employ of Haskins & Sells as accountant, and has been in their employ ever since. Their and his employment has always been as accountants for the state, and in opposition to the claims of the carriers. His employment by railroads was always in a subordinate position; his highest position being that of chief clerk to a chief of a division. His duties were practically all of a clerical nature. Since he has been in the employ of Haskins & Sells, he assisted in gathering evidence and making investigations for the use of the state in the Missouri rate cases, acting under the direction of a superior official of that firm. But, whatever the experience or lack of experience of these gentlemen may be, the statistics, as far as they go, and the assumptions, although adopted arbitrarily, where they could find no accurate data from the records, are of considerable value, so far as they have not been successfully attacked by witnesses of greater experience introduced by complainants in rebuttal. That they cannot be adopted by the court as a whole will no doubt be admitted by the learned counsel for the state; for not only have many of them been shown to be based upon arbitrary assumptions, which are incorrect, but many important items, which contribute materially to the greater cost of the state business, are conclusively shown to have been wholly overlooked by them. But, in the opinion of the court, the scheme itself furnishes the best method of solving this problem that has been called to the attention of the court, depending, of course, upon the correctness of the numerous factors necessary to obtain accurate results.

To determine these important issues under consideration, the court intends to adopt their scheme and ascertain in that manner, in connection with all the other testimony in these cases, the difference of the cost of the intrastate as compared with the through business, and it is of the opinion that in this way it will reach conclusions as nearly accurate as from the evidence is possible. That it will be mathematically accurate the court does not claim for it; but that is impossible, no matter what bases or schemes are adopted.

## Freight.

A most serious objection made is that the calculations of the state's accountants are based on the business of one month only, and treated as representative of a year, or even a six months, period; their schedules being based on the business of the Iron Mountain during the month of October, 1907, and of the Southwestern for the month of October, 1908. The reasons therefor are stated to be that the roads furnished these statements; Exhibit 26 being that of the Iron Mountain, and Exhibits 19 and 20 of the Southwestern. The auditors and statisticians of the roads who prepared and filed these statements deny emphatically that they represent a fair average of one-twelfth of a year's or one-sixth of a half year's earnings or expenses of either road, and give the following explanation for preparing these statements: On the part of the Iron Mountain it is claimed that it was prepared at the request of the state's accountants and filed in compliance with that request. That of the Southwestern was prepared for the purpose of ascertaining as near as possible the relative business and cost thereof as soon as possible after the temporary injunctions in these cases had been granted; that they were granted in September, 1908, and the test was made the first month thereafter. That it will show a fair relative condition of the business of the entire year is practically admitted; but it is emphatically denied that it shows such a fair average of the year's business as will enable the court to reach even an approximately correct conclusion as to what the average cost of the year's or half year's business is. The testimony establishes conclusively that the freight earnings of these roads for the month of October of any year are greater than those of any other month of that year. Exhibit 54, which gives the ton miles of the intrastate freight of the Iron Mountain for the six months ending December 31, 1907, shows that the average of ton miles for one month was 7,976,716, while that for the month of October of that period was 9,622,508 ton miles, a difference of over 20 per cent. The revenue received for the same period shows a still greater difference. The average revenue for one month during that period was $106,708.03, while that for the month of October was $131,286.45, a difference of nearly 22 per cent. in favor of the month of October. The interstate freight mileage for the six months period averages 102,050,616 ton miles, while that carried in October exceeds that average 8,646,842 ton miles, nearly 8 per cent. The Southwestern did not file any statistics for the latter half of the year 1908, the year its October test was made, but has filed statistics for the last half of 1907 and the first half of 1908. But it would not be fair to make a comparison with the first half of 1908, as the evidence shows that, while in 1907 the traffic was the most prosperous the roads ever enjoyed, that of the first half of 1908 was very much less, owing to the financial crisis, then felt most severely by the railroads of the country. But the conditions of the two roads, the sections traversed by them, are, so far as freight transportation is concerned, so nearly alike, with the exception of some of the low-class commodities, that it

may be assumed that the results would be the same, after making allowance for the differences mentioned.

It is also shown in evidence that, owing to the exceptionally large business of the railroads during the year 1907, it was almost impossible for these roads to carry all the freight offered to them for transportation. The freight yards were all congested, and in order to move the freight from 500 to 800 tons of interstate freight (this includes the dead weight) would be added to each local train, thus relieving to some extent the congested condition, but materially increasing the amount of through freight carried on local trains. As these conditions were exceptional, and the month of October, as shown, cannot be considered as an average of the year's business, they should not be considered as representative of those prevailing in normal times. But there is sufficient evidence to enable the court to make proper allowances, which will equalize these conditions.

As the October business exceeded that of the average month of the six months period over 20 per cent., multiplying it by that factor, of course, increases the entire totals by that amount, and, as the greater the tonnage the smaller the proportionate cost, all calculations should be made, when that month is used as the basis, after a reduction of 20 per cent., which will leave over 2 per cent. of the earnings (the earnings for that month being 22 per cent. greater than the average) for the additional expenses incurred by reason of the increased tonnage. It is also established by the evidence that errors were made in the tonnage of many cars transported during that month. On 34 cars the errors were found to run from 2,000 to 34,000 pounds a car. The investigation of Mr. Hamilton was confined solely to the records of the local cars, and they constituted, according to his testimony, 11.18 per cent. of all the cars moved on the Iron Mountain that month, and 10.09 per cent. of the Southwestern. Other serious objections made to the fairness of adopting the business of the month of October as a basis for a year's or six months period are the inaccuracy of his figures; but these can be corrected when the final calculations are made, if not corrected in the calculations made in detail.

## Apportionment of Expenses.

The schedules of apportionment of expenses submitted by the accountants for the state will each be taken up separately and findings made on them. The items which it is claimed by complainants were omitted will be considered separately thereafter.

## Freight—Operating Expenses.

[19] (1) Maintenance of Way and Structures.—Objections are made to this item as compiled by the accountants for the state upon the ground that it is guesswork solely, and that there is no basis upon which there can be a proper apportionment, except upon the straight revenue theory. It would serve no useful purpose to state the many objections made, except the one which, in the opinion of the court, is controlling. The overwhelming weight of the testimony shows that but a small part of the expenditures for maintenance of way and struc-

tures is caused by the operation of trains. Stations, platforms, and fences are but very slightly, if at all, affected by the operation of trains. Nor are the roadbed, ties, and ballast nearly as much affected by the operation of trains as by other causes. The greatest expense, it is shown by the testimony, is due to deterioration and action of the elements, regardless of the operation of trains. It is claimed by the witnesses introduced on behalf of the complainants that from 75 per cent. to 90 per cent. of this expense is due to the action of the elements, and only from 10 per cent. to 25 per cent. to the operation of trains. In view of these facts, any attempt to apportion this item of expense on the ton, car, or train mileage basis would be an injustice to the roads. The court is of the opinion that the straight revenue basis will get more accurate results. The difference in intrastate and interstate rates will be taken care of by proper allowance to be made on the final calculations of the entire cost.

(2) Maintenance of Equipment.—(a) Locomotives. These expenses are divided between yard service, local and through service. On the part of the state the yard locomotive mileage is based on cars, while, on the other hand, complainants urge the revenue basis. In the opinion of the court the car mile basis, as adopted by the state's accountants, including the allowance of 50 per cent. to the yard locomotive mileage and 75 per cent. for local locomotive mileage, is proper.

[20] (b) Freight Cars. This is divided between stopping and starting, terminal handling, and other expenses. On the part of the state the percentages suggested by Mr. Wellington in his work on Railway Expense Location are adopted, charging for stopping and starting 21.5 per cent., for terminal handling 13.5 per cent., and other expenses 65 per cent. The objection to the Wellington figures on the part of the railroads is that they were prepared in 1877, and since then many changes, which make them inapplicable, have been made, and for that reason should not be applied to conditions now prevailing. The evidence on that point is conflicting; but after a careful examination of all the testimony, taking into consideration the fact that, while the cars now in use are built much stronger than those in use at the time Mr. Wellington wrote his book, the appliance of the air brakes, instead of hand brakes, the less care exercised by trainmen by reason of the use of the automatic couplers, which dispenses with the necessity of going between the cars, and other items mentioned in the testimony, the court is of the opinion that 25 per cent. is a proper charge for damage to cars caused by stopping and starting. For terminal handling 13.5 per cent. is found by the court from the evidence as approximately correct.

In making the calculations on these items the accountants for the state assume that, while the local trains stop every 5 miles, each through train stops every 20 miles, and therefore that the local service should be charged with four times as much as the through service in proportion to the car mileage for expenses due to stopping and starting. They also assume that each car in local service receives two terminal handlings to one terminal handling of a car in through service, and for that reason the local service should be charged with

two times as much as through service in proportion to car mileage for expenses due to terminal handling. The court finds from the evidence that, while local trains stop every 5 miles, the through trains stop only every 35 miles, and for that reason the local trains are chargeable with seven times as much for that item as the through trains. In charging the through trains with one terminal handling in the state, they include the transstate freight, and charge that with one terminal handling. As the transstate business of the roads constitutes a very large percentage of the business, over 51 per cent. of the entire freight business in the state of Arkansas for the Iron Mountain, and nearly 65 per cent. of the Southwestern business, it is a matter of considerable importance to determine what should be properly charged for this item. The transstate business, which merely passes through this state, both of the terminals, that of starting and destination, being in other states, it will be seen that there should be a difference in the charge of terminal expense in this state.

A great deal of evidence has been introduced on the part of the state to show, when through trains carrying this transstate freight come into division yards, they are broken up and handled in the same manner as the interstate business, and for this reason it was very earnestly argued that it should be charged with one terminal. On the other hand, the evidence introduced on behalf of the railroads shows that, while there are some yard expenses connected with the transstate business, it is entirely free from the great expense caused by terminal handlings. It is true the handling of these transstate cars at terminal points differs very materially from the "crossing of a bridge"—a figure of speech indulged in by one of the witnesses for complainants. Still the evidence leaves no doubt in the mind of the court that the work connected with the transstate cars is not of that nature which should properly be called and charged as a terminal handling at any other place except that of starting and destination. The switching necessary for delivering and receiving the cars is saved. It is true there is considerable switching at every division point; but, as established by the evidence, in making up a through freight train the transstate cars are placed in such position in each train that all cars intended for a certain territory or for a certain branch road can be moved at one time and placed in a solid mass on the track from which they are to be finally moved. Besides, it is admitted that local freight originating at and destined for a point not a terminal, but which must pass an intermediate terminal yard, receives at such yards the same service as transstate cars do. As the transstate business is much heavier than either the interstate or local, the number of cars in these trains merely passing through the terminals is naturally larger. From the exhibits filed by Mr. Moore, who was night yardmaster at the Little Rock terminal in 1907, the transstate freight in these trains would average from 60 per cent. to 70 per cent. The cars would be moved in one body to tracks on which they were to be transported farther. Interstate business intended for that point would have to be taken to the different commercial tracks, and from there hauled to the industries to which they were consigned. They are handled by

carrying them in small lots of from one to three cars. They would be carried in some instances a distance of several miles, and after having been emptied they would have to be sent for and switched back to the freight yards of the company. If intended for other points in the state they would be handled like transstate cars, being switched over to the track on which the trains for these localities would be made up. The same expense would be incurred and the same injury to the cars caused in receiving and handling as local freight passing through these terminals. Mr. Moore filed with his testimony (Exhibit 53) what is called a "consist" of the through freight trains handled during the month of October, 1907, which shows the movement of the cars after they reached the Little Rock division yards. He takes for illustration the movement of one train, and thus explains it in his own language:

"It is shown by this consist that the cars destined to Texas are in the train beginning from the caboose, including 42 cars destined to Texas, and ahead of that are the cars for the Valley Division and Little Rock proper, and local south on short points beyond Little Rock. The first car mentioned in the consist at the top is the car next to the caboose at the rear of the train. The last car on the list is the car which is next to the engine. Those 42 cars destined to Texas would remain on the train on which they were received, and the 16 cars (there were 58 cars in the train) would be taken off the head of the train and put on such tracks as are designated for that purpose. The 42 cars would remain on the track on which they were received, and there would be added to that train more tonnage, and forwarded from the track on which we received it. They would not be switched. They would be sent out on the day they came in."

This consist shows that a very large percentage of the cars on all through freight trains and transstate were moved as testified by Mr. Moore. Mr. Cannon, who in 1907 was superintendent of the Arkansas division of the Iron Mountain, testified to the same facts, and also that at the Hoxie division yards the percentage of through freight is still greater and subject to less switching than at Little Rock. On the other hand, a former yardman of the Iron Mountain testified that as a rule the number of cars intended for transstate transportation constituted a small percentage, and are handled almost as much as those intended for local transportation.

All agree that the injury to freight cars incident to delivering and hauling them back to the yards is not incurred for the transstate cars. When cars are received from other lines for transstate transportation, there are no terminal expenses except the yard charges, and that is so well known that all of the witnesses who testified on that subject, those for the railroads as well as those for the state, agree that, when the transportation is over three or more lines, in the division of the earnings, extra allowances are made to the terminal roads, receiving as well as delivering, while a smaller proportion is paid to intermediate carriers, for the reason that there are no terminal expenses. Mr. Lincoln, one of the witnesses introduced by the state, who has had a great deal of experience as a railroad man, and, although at present not connected with any railroad, occupies the position of manager of the St. Louis Freight Bureau, which necessarily requires that he keep himself fully informed in all matters of this na-

ture, agreed with the witnesses of complainants on that subject that there should be no expenses charged in Arkansas for the terminal service of transstate business. Mr. Parker, a witness introduced by the state, who is the expert engineer for the Texas State Railroad Commission, also testified that, while transstate business would have the same expense as interstate attached to it in the yard service, there is none at the terminals.

But there are some items of the interstate business which are only charged with one terminal, which, in the opinion of the court, should be charged with two. The evidence shows that all the cotton handled in the state is credited to interstate earnings. While 30 per cent. of that is transported uncompressed, and therefore has only one terminal handling in the state, the other 70 per cent. has two terminal handlings in this state. The evidence shows that cotton is brought to the concentrating points, either on local trains or on what are called "pick-up" trains, trains which during the cotton season are used exclusively for picking up the cars loaded with cotton along the line, and before it is transported out of the state it is compressed. These cars are taken to the compress, there unloaded, the empty cars hauled to the yards, and after the cotton is compressed empty cars are carried to the compress for reloading. That part of the interstate traffic has two terminal handlings, as much as the local business, except that it is carried in train loads to the compress, instead of being hauled in small lots; but that is fully made up by the additional expense caused by first delivering the cotton to the compress and then delivering the empty cars for the purpose of transporting it out of the state after having been compressed. The evidence shows that cotton constitutes about 7 per cent. of the interstate business, or about 2.5 per cent. of the interstate and intrastate business of the Iron Mountain. It is therefore proper that of the 34 per cent. of the interstate business 2.5 per cent. should be charged with two terminal handlings, instead of one, for this cotton.

Another item of interstate traffic which receives to a great extent two terminal handlings in the state is lumber and forest products. The evidence shows that a material part of forest materials, especially staves and headings, are brought in the rough to the mills, and then, after having been finished as manufactured material, are reshipped on the interstate rate for the entire haul and the earnings credited to interstate traffic. Many of the larger mills have short roads, which carry the rough material to the mills. These are called "tap lines." Allowances made to them for these hauls will be considered by the court and included in determining the difference in rates between inter and intra state business, and for that reason need not be considered in determining this item. A small proportion of the grain brought in from other states is also handled twice. From all the evidence, the conclusion reached by the court is that 2 per cent. of the interstate business should be charged for the transportation of lumber and grain with two terminal handlings in the state.

Another item of interstate business which should be charged with two terminals is the Memphis and Ft. Smith freight for the state of

Arkansas. As has been stated hereinbefore, all of the Memphis business for points in Arkansas, and most of the Ft. Smith business destined to points in this state, is treated as interstate business, but the entire expense thereof charged to this state. It is hard to determine from the evidence how much this business amounts to; but a liberal estimate will make it 2 per cent., and this should also be charged with two terminals.

This item of terminal expense should therefore be divided upon the following basis:

| | | |
|---|---|---|
| Transstate, receiving no terminal handling............... | | 51.16% |
| Interstate, receiving one " " ............... | | 34.19% |
| Interstate, receiving two " " ............... | | 6.50% |
| Intrastate, receiving two " " ............... | | 8.15% |
| | | 100% |

The balance of expense on this item may properly be divided upon the basis adopted by the state's accountants, except that the ton mileage should be used, instead of the car mileage, as the weight of the car adds to the expense, and there is less injury in transporting empty cars than those loaded.

Supervision in General. The expenses under this head may properly be divided between local and through service on the basis of direct charges for maintenance and equipment after ascertaining the percentages according to the rules stated hereinbefore.

(3) Traffic Expenses.—The accountants for all parties agree that these expenses should properly be divided on a straight revenue basis.

[21] (4) Transportation Expenses.—(a) Station Expenses. These expenses should properly be divided on the basis of the ton mileage of each class of traffic, charging each intrastate ton with six handlings, the interstate with one handling, and the transstate with one-half handling. The intrastate is chargeable with six station expenses to equalize the difference in the length of the haul, taking into consideration only the difference in this state, which on the Iron Mountain is three times as long for interstate as for local, and therefore for the same distance the local cars would have to have three hauls to one for the interstate. This may do some slight injustice to the interstate business, after having made allowance for two handlings for 6.5 per cent. of that business; but it is not sufficient to affect the final result to any appreciable extent.

(b) Yard and Terminal Expenses. These expenses will be apportioned in the same manner as those of road locomotives. This does the interstate business some injustice, because every car passing through the terminal yards, whether transstate or interstate, has been included in this expense by the accountants and charged twice, once for being hauled in and again for being hauled out, although they receive but very little handling, as shown heretofore. But in view of the fact that no allowance was made for any handling under the head of terminal handling of cars, charging them with this station expense will equalize the two items.

(c) Fuel and Locomotive Expenses and Wages of Train Crews. In apportioning the expenses, these two items will be considered to-

gether. The court finds from the evidence that the cost of fuel and wages paid per train mile on local trains is 50 mills, while on the through trains it is 34 mills, a difference of 47 per cent. The local trains should therefore be charged with 47 per cent. greater cost for these two items.

(d) Engine House Expenses. The basis adopted by the state's accountants in apportioning this item of expense between local and through trains is approved.

(e) Other Train Expenses. These should be divided between state and interstate traffic on the basis of the gross earnings of each class of traffic during the six months period ending December 31, 1907. The difference in the dead weight of the different classes of trains will be considered hereafter.

(f) Loss and Damage to Freight. The basis upon which this division is made by the accountants for the state is upon the claims paid during the six months in controversy; the claims during the month of October having been examined for the purpose of ascertaining which are properly chargeable to local trains and through trains. The figures used by the state's accountants are undisputed, and will be adopted by the court.

(g) Supervision and General. These expenses should be divided on the basis of the direct charges to each of the transported classes as found in the foregoing items.

(5) General Expenses.—The apportionment of these expenses should be made on the basis of the supervision and general expenses under the head of equipment and transportation.

## Method of Dividing That Cost.

The state, in dividing these costs, adopted the movement for the month of October, 1907, as a far average for the entire period, with the result that the interstate freight cars are charged with nearly 75 per cent. of the freight carried on local trains. The evidence is practically conclusive that, owing to the congestion caused by the heavier freight traffic in 1907, from 500 to 800 tons gross of through freight were added to each local train in order to relieve the congestion. It is claimed, and there is testimony to support it, that the interstate freight carried on local trains of the Iron Mountain is about 25 per cent. and the intrastate 75 per cent.

To adopt the state's contention would certainly be unfair. When conditions are normal, the evidence shows that practically the only through freight carried on local trains is that intended for or coming from points intermediate between division yards. The practice is that through freight trains receive or deliver freight only at division points, and that all interstate freight consigned to intermediate points is taken from the through train at the division yard nearest the place to which it is destined and then hauled to the final destination on the local trains, and if shipped from this state it is carried on local trains to the division yards and then put on the through train. In view of the fact that the largest shipping point in the state, Little Rock, is the principal division point, a great deal of the freight intended for this state will naturally go there on through trains.

That the intrastate freight on local trains, when conditions are normal, is only 25 per cent., is too low, in the opinion of the court. The interstate business carried on local trains averages about 40 per cent. of the entire freight carried, and the calculations should be made on that basis; but the interstate must be charged with only one terminal. Of the local freight carried on through trains, 1 per cent. is a proper apportionment, and the calculations will be made accordingly.

(10) Taxes.—Taxes should be apportioned between freight and passenger and inter and intra state earnings on the straight revenue basis. A large part of the taxes paid by the railroads is for local improvements, such as levees, drainage, and roads. The local traffic, by reason of the development of the country and increased acreage of fertile lands, otherwise untillable, is benefited to a much greater extent than the through, especially the transstate, and should, therefore, bear its full proportion of that expense.

(10a) Rental of Tracks, etc.—This should be divided on the straight revenue basis, as has been done by the accountants for the state.

(11) Hire of Equipment.—As the cars used on local trains are delayed much more by reason of the slow schedules, great delays in returning cars to consignors and consignees, each being entitled by the laws of the state to retain the car 48 hours for loading and unloading, the fact that the local trains are not running at night, and the haul shorter, the apportionment of this item on the straight revenue basis, adopted by the accountants for the state, is approved, but there should be an extra charge of 30 per cent. to the local traffic. The court, having determined what the basis of apportionment of expense should be, has referred it to the accountants employed by the complainants, as well as the defendants, and they have presented to the court the result of their calculations which are filed with this opinion as Exhibit A. These calculations show that the percentage of extra cost of the intrastate business over the transstate and interstate is 201.5 per cent. for the Iron Mountain Railway.

## Omissions.

The court finds from the evidence that in preparing their schedules the accountants for the state omitted several items which add materially to the cost of the local as compared with the through traffic, and which should be taken into consideration in determining the difference in cost. The evidence shows that the dead weight on local trains exceeds that on the through over 14 per cent.; the percentage being on local 75.5 per cent. and through 64.75 per cent. There is considerable loss on the investment in rolling stock from several causes not included in any of the state's schedules. The evidence shows that, while the through freight trains are run day and night, the local trains run only during the day; that the local trains do not run on Sundays, while the through trains do; that the average run a day of the locals is 60 miles, and that of the through 240 miles. Local trains are run regularly every day except Sundays as scheduled, whether loaded or not, while through freight trains, there being a number of them daily, are not all sent out unless there is sufficient tonnage to justify it. The expense of trains thus not sent out, including fuel and wages, is

saved. Demurrage on cars received or delivered, as hereinbefore stated, is an item which adds to the loss on the investment.

While the difference in the length of the haul in the state has been considered, that in the other states, even on the lines of these roads, has not been taken into consideration. As all agree that the longer the haul the less the cost per mile, the fact that this haul is in other states cannot in anywise affect the decrease of the cost, as the crossing of imaginary state lines can neither add to nor decrease it. What this mileage amounts to cannot be ascertained from the evidence; but that it is very considerable, especially for the transstate traffic, must be apparent. The great bulk of the grain comes from Kansas and Nebraska, and is transported through the state to the Gulf ports for export. Cotton shipped from the state is transported almost exclusively to the seaports for export or the cotton mills of New England on the Atlantic coast. Most of the lumber shipped from the state goes to the prairie states of the West and to the commercial centers of the East and North. Iron, steel, and machinery comes principally from the Pittsburg district in Pennsylvania.

The evidence also shows that the percentage of freight in less than car loads on the local trains exceeds that on the through trains of the Iron Mountain considerably. It is also shown that the loading of less than car loads of freight on through trains is much heavier and less expensive to handle, as it is consigned to large cities, which enables the roads to a very great extent to fill cars, so that they require only one loading and unloading, while on local trains the less than car load freight is consigned to many small stations in small lots, requiring a number of unloadings, with a continual decrease of tonnage.

The reciprocal tonnage, it is shown, is much less on local than on through trains. Other items which it is claimed by complainants have been omitted have either been considered, or proper allowance made therefor by the court in the items of the schedules, or are not proper items for additional allowance.

Upon full consideration of the additional cost of these additional items, the court is of opinion that an additional charge of 8.5 per cent. will be reasonable and fair, making the total difference in cost between intra and inter state freight 210 per cent. in favor of the intrastate.

### Passenger.

The evidence shows that for the year 1907 the actual fares collected for each passenger mile on the Iron Mountain were for the local 1.930 cents and on through 1.865 cents, a difference of 3.48 per cent. The court does not deem it necessary to have the same itemized calculations made to ascertain the difference in cost between the intrastate and interstate passenger traffic as were made on the freight. The evidence does establish the fact that there is some difference in the cost. Some of these items which cause additional cost are that transstate passengers cause no terminal expense and but very little station expense; interstate passengers only use one terminal, while local passengers incur two; the average haul of intrastate passengers is 30 miles, that of through 118 miles, in this state, leaving out of consideration the length of the haul in other states, which, for the transstate,

is no small item; the additional expense in the sale of tickets, checking baggage for short trips, the overhead expenses connected therewith, the more frequent cleaning of coaches after every trip; the additional expense for fuel and wages; the slower time; the more frequent stops; the shorter trains; the loss on the investment by reason of less mileage; the greater danger of injury to passengers by the more frequent getting on and off; the greater injury to the equipment by the more frequent stops and starting—are all matters which add to the cost. On the other hand, allowance must be made for the local passengers riding on through trains and interstate passengers on local trains. Giving due weight to all these items and others appearing in the testimony, the court is of opinion that, after deducting the increased revenue, the intrastate passenger service should be charged with 10 per cent. greater net cost than the through.

## Southwestern Railway Company—Freight.

It will serve no useful purpose to make calculations item by item for this road, as has been done in the case of the Iron Mountain, as, with few exceptions, the conditions are the same and the exceptions only need be considered. The evidence shows that the freight traffic of that road between transstate, interstate, and intrastate is less favorable to the state than that of the Iron Mountain. The percentages on this road are:

Transstate .............................................. 64.93%
Interstate .............................................. 32.12%
Intrastate ............................................. 2.95%
                                                        ————
                                                        100%

It is also shown that the average length of the haul is greater for the interstate than on the Iron Mountain; the state haul of this road being 40.79 miles, and the interstate 222.42 miles. The average haul of all interstate freight over that line, disregarding state lines, is 344.41 miles.

There are some other matters which add some to the increased cost of the local business; but they are so small that it is unnecessary to mention them. Upon the whole, the court is of the opinion that an additional allowance of 40 per cent. above that of the Iron Mountain for extra expenses of the local traffic, making the difference in cost 250 per cent., will be fair. The state tariff is found to be, as that of the Iron Mountain, 50 per cent. higher than the interstate.

## Passenger.

The court finds that the extra cost of the intrastate passengers on this road is something less than on the Iron Mountain, although the length of the carriage of interstate passengers, as compared with the local, is greater than that of the Iron Mountain; the local being 23 miles and through 120 miles.

It also appears that all of its trains do a local passenger business. Its so-called through trains stop, with few exceptions, at almost every station in the state, and a great deal of the local traffic is carried on these trains. It also appears that the difference in the fares between

local and through passengers is greater than that on the Iron Mountain; the percentage being a little over 10 per cent. The court is of the opinion that the difference in cost between the two classes of passenger service is no greater than the higher fares which have been collected, and for this reason no extra allowance should be made therefor.

Upon these bases the court finds the net profits on the entire business of the two roads to be as follows:

### Iron Mountain Railway.

Intrastate freight:
Cost on basis of 210 per cent. additional cost calculated on ton mile basis for operating expenses and revenue basis for taxes, rentals, and hire of equipment.................. $ 643,679.33
Intrastate passenger:
Cost on basis of 10 per cent. additional cost calculated on revenue basis.................................... 1,044,879.50

Total cost of intrastate............................ $1,688,558.83
Earnings from intrastate traffic:
Freight ........................................... $ 656,717.58
Passenger ......................................... 1,069.861.28

Total earnings..................................... $1,726,578.86
Cost deducted...................................... 1,688,558.83

Net earnings....................................... $   38,020.03

The valuation of the investment apportioned to the intrastate business is $5,158,266.56, which makes the net earnings less than three-fourths of 1 per cent.

### Southwestern Railway.

Intrastate freight:
Cost apportioned as above on basis of 250 per cent. additional cost ........................................... $156,171.86
Intrastate passenger:
Cost on straight revenue basis, with no extra allowance.... 273,049.21

Total cost of intrastate............................ $429,221.07
Earnings from intrastate traffic:
Freight ........................................... $175,515.42
Passenger ......................................... 290,960.77

Total earnings..................................... $466,476.19
Cost deducted...................................... 429,221.07

Net earnings....................................... $  37,255.12

The valuation apportioned to the intrastate business is $1,634,350, which makes the net earnings less than 2.3 per cent. on the investment.

### Net Profits on Investment.

[22] There is no charge on the part of the state that these roads are not efficiently, economically, and honestly managed; nor is it denied that they traverse a fertile agricultural section, with natural resources, such as timber, coal, stone, and minerals, sufficient to justify their construction; and they were constructed in pursuance of a public demand, and are in every way necessary for present conditions, and that they were not built merely for speculative purposes, depend-

ent on the future development of the natural resources so bountifully bestowed on the people of this state by Providence. Nor is there any claim that, owing to the topographical conditions, the cost of building them or the investment necessary for their construction and operation is greater than the average cost of roads in the Southwest. What would, under these conditions, be a reasonable net return on the investment?

In Willcox v. Consolidated Gas Co., 212 U. S. 19, 48, 29 Sup. Ct. 192, 198, 53 L. Ed. 382, Mr. Justice Peckham, speaking for the court, said on that subject:

"There is no particular rate of compensation which must, in all cases and in all parts of the country, be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality. Among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted, and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them. There may be other matters which, in some cases, might also be properly taken into account in determining the rate which an investor might properly expect or hope to receive, and which he would be entitled to without legislative interference. The less risk, the less right to any unusual returns upon the investments. One who invests his money in a business of a somewhat hazardous character is very properly held to have the right to a larger return, without legislative interference, than can be obtained from an investment in government bonds or other perfectly safe security. The man that invested in gas stock in 1823 had a right to look for and obtain, if possible, a much greater rate upon his investment than he who invested in such property in the city of New York years after the risk and danger involved had been almost entirely eliminated.

"In an investment in a gas company, such as complainant's, the risk is reduced almost to a minimum. It is a corporation which, in fact, as the court below remarks, monopolizes the gas service of the largest city in America, and is secure against competition under the circumstances in which it is placed, because it is a proposition almost unthinkable that the city of New York would, for purposes of making competition, permit the streets of the city to be again torn up in order to allow the mains of another company to be laid all through them to supply gas which the present company can adequately supply. And, so far as it is given us to look into the future, it seems as certain as anything of such a nature can be that the demand for gas will increase, and, at the reduced price, increase to a considerable extent. An interest in such a business is as near a safe and secure investment as can be imagined with regard to any private manufacturing business, although it is recognized at the same time that there is a possible element of risk, even in such a business. The court below regarded it as the most favorably situated gas business in America, and added that all gas business is inherently subject to many of the vicissitudes of manufacturing. Under the circumstances, the court held that a rate which would permit a return of 6 per cent. would be enough to avoid the charge of confiscation, and for the reason that a return of such an amount was the return ordinarily sought and obtained on investments of that degree of safety in the city of New York."

And the court concurred with the conclusions of the trial court that, in view of the conditions found in that case, 6 per cent. upon the value of the property of the gas company devoted to public use would be a just compensation.

But it is urged on behalf of complainants that in states like Arkansas, owing to many conditions, including the higher rates of interest for the use of money, they are entitled to a greater compensation

than a gas company in a city like New York. It is urged that a railroad company cannot be as secure against competition as a gas company in a large and populous city. It requires no permits for the tearing up of the streets of a commercial city and thus seriously interfere with its traffic, nor would the experience of the past justify the conclusion that an investment in railroads is "as near a safe and secure investment as can be imagined with regard to any private manufacturing business," for it is claimed that it is a well-known fact that the number of railroads of the United States, especially those west of the Mississippi river, which have escaped insolvency proceedings at all times, is very small, if there be any. Whether some allowance should be made for that period which may be called the "developing period," when the earnings are barely sufficient to cover actual operating expenses, followed by that period during which the net profits above the operating expenses are barely sufficient to pay the interest on the bonded indebtedness, with no margin of profit to the shareholders, it is unnecessary to determine in these cases, as there is no evidence in the record that these complainants have suffered from such conditions. It is true the records of this and other courts show that insolvency proceedings against these roads were had at one time, or more than once, perhaps, and foreclosures had; but there is no such evidence in this record, and therefore cannot be considered.

That under the laws of this state competitive roads may at any time be constructed is no doubt true; but the stringent regulations under the national and state laws now in force have made the construction of railroads for the mere speculative purpose of selling bonds and stocks, regardless of a legitimate demand or necessity, too unprofitable for promoters and speculators to indulge in. The court therefore concludes that net earnings which will give the owners a return of 6 per cent. per annum on the actual value of the property are fair, provided, of course, that the rates necessary to make whatever net profits the court finds the owners to be entitled to are reasonable, and not so high as to be oppressive to those compelled to make use of the roads; for, as stated in the first part of this opinion:

"The rights of the carriers and the public are reciprocal. The carrier is entitled to ask a fair return upon the value of its property which it employs for the public convenience, and the public is entitled to demand that no more be exacted from it for the use of the public highways than the services rendered are reasonably worth and not be oppressive."

But when such a limitation of profits is adopted, as the construction of railroads is beneficial and necessary for the development of a country, and for that reason it would be against the public welfare to discourage them, provision should be made for making this limited profit as nearly permanent and uniform as is possible by providing a surplus for those years when, owing to contingencies likely to arise at any time, the net earnings will not yield a sufficient fund for such earnings. By this the court does not mean to be understood that the state must be an insurer of profits on railroad investments; but when the profits on investments, based as they are in these cases on the actual value of the property, ascertained by the state itself, and not

a speculative value of bonds and stocks issued in many instances regardless of cost or values, are limited to the current and legal rate of interest of the state, such investments are entitled to a greater consideration than when there is no such limitation and the investor takes his chance of large profits when times are prosperous and small or no profits during lean years. Besides, rates of carriers cannot and ought not to be changed every year, or at short periods, to meet conditions as they vary; for not only would the commerce of the country be seriously affected by such changes and consequent uncertainties, but it would necessitate frequent investigations and hearings, expensive and uncertain of results, with strong probabilities that, before one investigation is completed and conclusions reached, conditions will again be changed and necessitate another. Earnings which would yield a profit of 6 per cent. in a year like 1907, which was the most profitable year in the history of railroads of this country, or which would yield such a profit when crops and financial conditions are normal, all branches of manufacture and trade flourishing, the elements favorable, would soon decrease to an extent which would reduce net profits considerably below 6 per cent., if not wipe them out entirely, when conditions are reversed. The most learned and advanced political economists have not yet discovered a remedy to prevent the periodical financial crises, although many theorists sincerely believe that they have. The scientists of the Agricultural Department, even with the aid of the learned men of the Weather Bureau, are still unable to prevents drouths, or too much rainfall, hot winds, destructive storms, or other unfavorable conditions, which may cause failures of crops, and which, in an agricultural state, such as this is, will very materially affect the earnings of its railroads. Continued rainstorms, which are not so unusual in this section that they should not be taken into consideration, may cause washouts and damage to the tracks and bridges, to replace which will materially reduce the net earnings. Breaks in the levees of the Mississippi or other rivers now protecting these roads and the lands served by them may cause sufficient destruction to wipe out all profits of that year. It frequently happens that many miles of railroad have to be abandoned, or reconstructed to an extent to make the cost equal to the construction of a new road for that section. Bridges must be in time renewed, and with the continual increase of weight of locomotives and cars must at times be rebuilt. The Interstate Commerce Commission, in Re Investigation of Advances in Rates, Eastern Cases, 20 Interst. Com. Com'n R. 271, said on that subject:

"It may well be said that they should be allowed to accumulate a fund out of its revenues for operation against the time when this piece of railroad must be entirely thrown away. Under our present system of accounting railways are required to make a depreciation charge with respect to the equipment for the purpose of providing against contingencies of this sort; but they make no such charge with respect to way and structures, and it seems proper that the accumulation of surplus should be allowed for this also."

Ought not all these matters be taken into consideration, and provision made for emergencies which experience teaches the roads are

at all times subject to and which at any time may occur? To provide for these the court is of the opinion that, in addition to the 6 per cent. earned when everything is prosperous and no extraordinary losses by casualties have been sustained, an allowance of 1.5 per cent. additional for a surplus fund should be made. As stated by the Interstate Commerce Commission in Re Investigation of Advances in Rates, Western Cases, 20 Interst. Com. Com'n R. 307, 336:

> "A railroad is justified, no doubt, in maintaining a surplus which will insure dividends to its stockholders during lean years, and it may accumulate through the years funds to meet obsolescence in plant, unless this charge is taken care of in maintenance. * * * Such a surplus gives strength and tone to the securities of a carrier. It invigorates and stimulates the management."

In the Eastern Cases of that investigation, 20 Interst. Com. Com'n R. 243, 271, 288, the commission said on that subject:

> "Then, too, a railroad must be allowed to accumulate a surplus in good years which will offset bad years, and if its financial position is to be a reasonably strong one that surplus must be large enough to remove doubt from the mind of the investing public. We think that a railroad in ordinary years should be permitted to show a substantial surplus over and above the payment of a reasonable dividend. * * * If this company is to preserve its financial integrity upon the basis of its present capitalization and maintain its credit, it is proper that it should be allowed to earn a sufficient amount to pay its interest, its preferred dividend, a dividend on its common stock, and have remaining a small surplus. The credit of the company cannot be maintained for year after year upon any other basis. We are of the opinion that the sum remaining after payment of fixed charges, including as a fixed charge the dividend upon the preferred stock, should be equivalent to between 7 and 8 per cent. upon the common stock. It should have sufficient earnings so that it may pay a dividend of 5 per cent. upon its common stock and carry 2.5 per cent. to surplus, or pay 6 per cent. on the common stock and carry 1.5 per cent. to surplus. This is on the assumption that the capitalization does not exceed its actual value."

In the cases at bar only the actual value is considered, regardless of capitalization. That such a surplus may be necessary is shown by the facts appearing in the testimony in these cases. The Iron Mountain, for the years 1904, 1905, 1906, and 1907, paid its stockholders 10 per cent. annually; for the year 1908 the dividend was reduced to 5 per cent.; and for the year 1909 to 4 per cent. The evidence fails to show the reasons for this reduction of dividends; but the court does not feel justified in assuming that it was owing to an increase in net earnings caused by the granting of the injunction in these cases. The Southwestern has never paid any dividend on its common stock, and only for the last two years a dividend of 2 per cent. in 1909 and 5 per cent. in 1910, on its preferred stock. It is also proper to state that the calculations made in these cases are all based on earnings for the six months ending December 31, 1907, which, as appears from the evidence, were approximately 20 per cent. greater than under usual conditions.

In the opinion of the court the rates enjoined at the commencement of these actions are noncompensatory and confiscatory, and for this reason the injunctions will be made permanent. The costs in these cases should be divided, each party paying its own costs for deposi-

tions, etc., and the court costs proper to be paid one-half by the complainants and one-half by the defendants. As conditions may change which may require a reinvestigation of the question of the reasonableness of these rates, the court will retain jurisdiction of these causes, with leave to the parties to move the court for a reinvestigation. This course was adopted by Mr. Justice Brewer in Ames v. Union Pacific Ry. Co., supra, and commends itself to the court as proper in these cases.

## Conclusion.

In the absence of separate accounts kept by the railroads, the scheme suggested by the state's accountants in these cases commended itself favorably to the court. The omissions and those bases which in the opinion of the court were found to be erroneous in these cases may properly be attributed to the fact that such a scheme has never been attempted before this, and the further fact that these gentlemen have not had that experience which can only be obtained by those who have devoted many years to the management and operation of railroads. The testimony of these gentlemen of experience has shown these errors and omissions, and the court has tried to correct them. To do so it was necessary to read carefully all the voluminous testimony in these cases, not only once, but in many instances a number of times. If the expenses were kept separately for the different classes of traffic for the year, or, if that is too expensive, if they were kept for the months of March and November of every year, they would furnish a very fair average for the year for this section of the country, and would relieve the courts in cases of this nature of a great deal of work. In fact, if such accounts were kept, the court believes that State Railroad Commissions would be guided by them to a great extent in making rates.

In conclusion the court wishes to acknowledge the assistance it has received from Messrs. Johnson and Hamilton, the accountants for the complainants and the state, in these cases, in making the calculations for its use. The accuracy with which they performed this work is attested by the fact that the result of their calculations, made under direction of the court, did not differ one cent. The extended and able arguments of the counsel for both sides were of inestimable assistance to the court, and the final result reached by the court, if correct, is in a great measure due to their aid.

### EXHIBIT A.

#### State of Arkansas—Rate Matter.

#### St. Louis, Iron Mountain & Southern Railway.

Result of operation obtained on the formulæ prescribed by the court:

#### Revenue.

The miscellaneous revenue has been divided between intrastate and interstate traffic, on the basis of the actual state and interstate revenue, and some additional items have been added to the passenger revenue.

The result of this division is as follows:

### Freight Revenue.

|  |  | Per Cent. of Each Class. | Per Cent. of All Revenue. |
|---|---|---|---|
| Intrastate | $ 656,717.58 | 13.41 | 9.81 |
| Interstate | 4,239,555.33 | 86.59 | 63.34 |
| Total | $4,896,272.91 | 100.00 | 73.15 |

### Passenger Revenue.

|  |  |  |  |
|---|---|---|---|
| Intrastate | $1,069,861.28 | 59.54 | 15.99 |
| Interstate | 727,026.60 | 40.46 | 10.86 |
| Total | $1,796.887.88 | 100.00 | 26.85 |
| Grand total | $6,693.160.79 |  | 100.00 |

### Operating Expenses.

#### 1. Maintenance of Way and Structures.

The total expense assigned to the freight business under this head has been divided between intrastate and interstate on the straight revenue basis, and the result is as follows:

|  | Intrastate. | Interstate. | Total. |
|---|---|---|---|
| Freight revenue | $656,717.58 | $4,239,555.33 | $4,896,272.91 |
| Percentage of each | 13.41 | 86.59 | 100.00 |
| Expenses divided on above percentages | $ 74,210.28 | $ 479,184.83 | $ 553,395.11 |

#### 2. Maintenance of Equipment.

(a) Locomotives.—The expenses under this head were divided between yard and local and through road locomotives on the basis adopted by the state in its Exhibit K, and are as follows:

|  | Local. | Through. | Total. |
|---|---|---|---|
| Yard | $13,453.83 | $ 55,681.97 | $ 69,135.80 |
| Road | 43,733.35 | 70,807.25 | 114,540.60 |
| Total | $57,187.18 | $126,489.22 | $183,676.40 |

(b) Freight Cars.—This expense is divided between stopping and starting, terminal handling, and other expenses on the following basis:

|  | Percentages. | Expenses. |
|---|---|---|
| Stopping and starting | 25 | $119,473.91 |
| Terminal handling | 13½ | 64,515.91 |
| Other expenses | 61½ | 293,905.82 |
| Total | 100 | $477,895.64 |

The expense of "stopping and starting" is divided as shown in the State's Exhibit K, and is as follows:

|  | Local. | Through. | Total. |
|---|---|---|---|
| Car Miles | 4,693,400 | 6,532,646 | 11,226,046 |
| Percentage of each | 41.81 | 58.19 | 100.00 |
| Expenses—divided on above percentages | $49,952.04 | $69,521.87 | $119,473.91 |

The expense of "terminal handling," divided between transstate, interstate, and intrastate freight on basis of the ton mileage for the month of October, 1907, as shown in Exhibit 26 and subdivided by the court, is as follows:

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Transstate freight (receiving no terminal handling) |  |  |  |  | 51.16% |
| Interstate | " | " | one | " | " | 34.19% |
| Interstate | " | " | two | " | " | 6.50% |
| Interstate | " | " | two | " | " | 8.15% |
|  |  |  |  |  | 100.00% |

The total expense is therefore divided on the following percentages:

|  | | Percentages. | Expense. |
|---|---|---|---|
| Interstate | $\begin{cases} 31.19 \text{ x } 1=34.19 \\ 6.50 \text{ x } 2=13.00 \end{cases}$ | 53.85<br>20.48 | $34,741.82<br>13,212.86 |
| Intrastate | 8.15 x 2=16.30 | 25.67 | 16,561.23 |
| | 63.49 | 100.00 | $64,515.91 |

The balance of the expense of freight cars is divided between local and through trains on the basis of the number of car miles as shown in the State's Exhibit K, and is as follows:

|  | Local. | Through. | Total. |
|---|---|---|---|
| Car miles | 1,173,350 | 6,532,646 | 7,705,996 |
| Percentage of each | 15.22 | 84.78 | 100.00 |
| Expense | $44,732.47 | $249,173.35 | $293,905.82 |

The total expense of maintenance of freight cars chargeable to each class of service, under the plans outlined above, is as follows:

|  | Stopping and Starting. | Terminal Handling. | Other Expense. | Total. |
|---|---|---|---|---|
| Local | $ 49,952.04 | | $ 44,732.47 | $ 94,684.51 |
| Through | 69,521.87 | | 249,173.35 | 318,695.22 |
| State | | $16,561.23 | | 16,561.23 |
| Interstate | | 47,954.68 | | 47,954.68 |
| Total | $119,473.91 | $64,515.91 | $293,905.82 | $477,895.64 |

(c) Supervision and General.—This expense is divided between local and through trains and state and interstate on the basis of the direct charges for maintenance of equipment, and is as follows:

|  | Direct Expense. | Percentages. | Amount. |
|---|---|---|---|
| Local | $151,871.69 | 22.96 | $14,202.89 |
| Through | 445,184.44 | 67.29 | 41,625.12 |
| State | 16,561.23 | 2.50 | 1,546.48 |
| Interstate | 47,954.68 | 7.25 | 4,484.80 |
| Total | $661,572.04 | 100.00 | $61,859.29 |

### 3. Traffic Expense.

These expenses divided on the straight revenue basis are as follows:

|  | Percentages. | Amount. |
|---|---|---|
| Intrastate | 13.41 | $11,899.29 |
| Interstate | 86.59 | 76,855.13 |
| Total | 100.00 | $88,734.42 |

### 4. Transportation Expense.

(a) Station Expense.—This expense is divided on basis of the proportions of the ton miles for the month of October, 1907, as shown in Exhibit No. 26, assuming that one-half of the transstate and all the interstate freight is chargeable with one station handling, compared with six station handlings for state freight, for a given number of ton miles, as follows:

|  | Ton Mile Per Cents. | | | Expense. |
|---|---|---|---|---|
| Transstate | 51.16 x ½= 25.58 | | 22.21 | $ 51,888.54 |
| Interstate | 40.69 x 1 = 40.69 | | 35.33 | 82,540.40 |
| Intrastate | 8.15 x 6 = 48.90 | | 42.46 | 99,198.00 |
| | 100.00 | 115.17 | 100.00 | $233,626.94 |

(b) **Yard and Terminal Expense.**—This expense is divided between local and through trains on the basis of the number of cars handled at terminals as shown in the State's Exhibit K, and is as follows:

|  | Local. | Through. | Total. |
|---|---|---|---|
| Cars handled | 32,232 | 133,482 | 165,714 |
| Percentage of each | 19.46 | 80.54 | 100.00 |
| Expenses divided on the above percentages | $57,085.42 | $236,262.07 | $293,347.49 |

(c) **Fuel and Locomotive Expenses—Road Enginemen and Trainmen.**—These expenses are divided between local and through trains on the basis of the number of engine miles of each class, assuming that the local train expense is 47 per cent. greater per engine mile than the through train expense.

|  | Train Miles | Percentages. | | Percentages. | Expenses. |
|---|---|---|---|---|---|
| Local | 70,583 | 26.42 x 1.47=38.83 | | 34.54 | $238,060.24 |
| Through | 196,512 | 73.58 | 73.58 | 65.46 | 451,170.33 |
| Total | 267,095 | 100.00 | 112.41 | 100.00 | $689,230.57 |

(d) **Engine House Expenses.**—These expenses are divided on the basis shown in the State's Exhibit K, and are as follows:

|  | Local. | Through. | Total. |
|---|---|---|---|
| Engine miles | 79,053 | 199,981 | 279,034 |
| Percentage of each | 28.33 | 71.67 | 100.00 |
| Expenses divided on above percentage | $15,194.55 | $38,439.58 | $53,634.13 |

(e) **Other Train Expense.**—These expenses are divided between state and interstate traffic on the basis of the gross earnings of each class of traffic, as follows:

|  | Percentages. | Amount. |
|---|---|---|
| Intrastate | 13.41 | $ 17,743.16 |
| Interstate | 86.59 | 114,569.71 |
| Total | 100.00 | $132,312.87 |

(f) **Loss and Damage to Freight.**—The division of this expense is shown in State's Exhibit K, as follows:

|  | Amount. |
|---|---|
| Intrastate | $ 30,972.03 |
| Interstate | 96,537.35 |
| Total | $127,509.38 |

(g) **Supervision and General.**—This expense is divided on the basis of the direct charges to other accounts under Transportation, and is as follows:

|  | Direct Expense. | Percentages. | Amount. |
|---|---|---|---|
| Local | $ 310,340.21 | 20.28 | $ 9,410.51 |
| Through | 725,871.98 | 47.46 | 22,022.83 |
| State | 147,913.19 | 9.67 | 4,487.16 |
| Interstate | 345,536.00 | 22.59 | 10,482.42 |
| Total | $1,529,661.38 | 100.00 | $46,402.92 |

### 5. General Expenses.

This expense is divided on the basis of the Supervision and General Expense under the head of Maintenance of Equipment and Transportation, and is as follows:

|  | Direct Expense. | Percentages. | Amount. |
|---|---|---|---|
| Local | $ 23,613.40 | 21.81 | $ 28,836.80 |
| Through | 63,647.95 | 58.80 | 77,744.33 |
| State | 6,033.64 | 5.57 | 7,364.55 |
| Interstate | 14,967.22 | 13.82 | 18,272.56 |
| Total | $108,262.21 | 100.00 | $132,218.24 |

### 6. Total Operating Expenses.

The total operating expenses, divided on the various bases outlined above, are as follows:

|  | Amount. |
| --- | --- |
| Local ........................................... | $ 514,662.10 |
| Through ........................................ | 1,312,448.70 |
| State .......................................... | 263,982.18 |
| Interstate ..................................... | 982,750.42 |
| Total ....................................... | $3,073,843.40 |

### 7. Local Train Expenses.

These expenses are divided between intrastate and interstate on the following percentages:

|  | Percentages. | Amount. |
| --- | --- | --- |
| Intrastate ................................... | 60 | $308,797.26 |
| Interstate ................................... | 40 | 205,864.84 |
|  | 100 | $514,662.10 |

### 8. Through Train Expenses.

These expenses are divided between intrastate and interstate on the following percentages:

|  | Percentage. | Amount. |
| --- | --- | --- |
| Intrastate ................................... | 1.00 | $ 13,124.49 |
| Interstate ................................... | 99.00 | 1,299,324.21 |
|  | 100.00 | $1,312,448.70 |

### 9. Recapitulation—Operating Expenses.

|  | Intrastate. | Interstate. | Total. |
| --- | --- | --- | --- |
| Local train................... | $308,797.26 | $ 205,864.84 | $ 514,662.10 |
| Through train................ | 13,124.49 | 1,299,324.21 | 1,312,448.70 |
| Direct charges............... | 263,982.18 | 982,750.42 | 1,246,732.60 |
| Total ................... | $585,903.93 | $2,487,939.47 | $3,073,843.40 |

### 10. Taxes and Rentals.

The taxes and rentals, divided on a straight revenue basis, are as follows:

|  | Per Cent. | Taxes. | Rentals. |
| --- | --- | --- | --- |
| Intrastate ...................... | 13.41 | $ 21,851.02 | $ 2,156.94 |
| Interstate ...................... | 86.59 | 141,094.67 | 13,927.62 |
| Total ..................... | 100.00 | $162,945.69 | $16,084.56 |

### 11. Hire of Equipment.

This amount is divided between intrastate and interstate traffic on the revenue basis, with 30 per cent. added to cover the additional cost of the state traffic. The result is as follows:

|  | Revenue. | Percentage. |  | Percentage. | Amount. |
| --- | --- | --- | --- | --- | --- |
| Intrastate ..... | $ 656,717.58 | 13.41 x 1.3=17.43 | | 16.76 | $ 30,032.49 |
| Interstate ...... | 4,239,555.33 | 86.59 | 86.59 | 83.24 | 149,158.97 |
|  | $4,896,272.91 | 100.00 | 104.02 | 100.00 | $179,191.46 |

### 12. Recapitulation—Freight.

|                              | Intrastate.  | Interstate.    | Total.        |
|------------------------------|--------------|----------------|---------------|
| Gross revenue.............   | $656,717.58  | $4,239.555.33  | $4,896,272.91 |
| Operating expenses, par. No. 9.. | $585,903.93 | $2,487,939.47 | $3,073,843.40 |
| Taxes, par. No. 10............. | 21,851.02 | 141,094.67 | 162,945.69 |
| Rentals, par. No. 10........... | 2,156.94 | 13,927.62 | 16,084.56 |
| Hire of equipment, par. No. 11 | 30,032.49 | 149,158.97 | 179,191.46 |
| Total expenses................ | $639,944.38 | $2,792,120.73 | $3,432,065.11 |
| Net earnings............ | 16,773.20 | 1,447,434.60 | 1,464,207.80 |

The bases on which the foregoing figures were compiled were prescribed by the court. The results obtained are correct on the bases indicated.

F. R. Johnson, for the Railroads.
T. A. Hamilton, for the State.

### State of Arkansas—Rate Matter.

#### St. Louis, Iron Mountain & Southern Railway.

Taxes and assessed value of property divided between the various classes of business on basis of gross revenue:

|                                | Taxes.      | Assessed Value of Property. |
|--------------------------------|-------------|------------------------------|
| Intrastate freight.............. | $ 21,851.02 | $ 1,961,340.96 |
| Interstate freight.............. | 141,094.67 | 12,663,744.82 |
| Total ............................ | $162,945.69 | $14,625,085.78 |
| Intrastate passenger............ | $ 35,249.16 | $ 3,196,925.79 |
| Interstate passenger............ | 23,953.33 | 2,171,270.43 |
| Total ............................ | $ 59,202.49 | $ 5,368,196.22 |
| Total freight and passenger...... | $222,148.18 | $19,993,282.00 |
| Total intrastate business........ | $ 57,100.18 | $ 5,158,266.75 |
| Total interstate business........ | 165,048.00 | 14,835,015.25 |

Operating expenses per ton per mile:
Intrastate ............................................. 12.24 mills.
Interstate ............................................. 4.06 "

Excess cost of intrastate over interstate.............. 8.18 "
Percentage of excess cost.............................. 201.5

The bases on which the foregoing figures were compiled were prescribed by the court. The results obtained are correct on the bases indicated.

F. R. Johnson, for the Railroads.
T. A. Hamilton, for the State.